No. 15-14117-EE

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS;
FLORIDA DEPARTMENT OF CORRECTIONS,

Defendants-Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

BRIEF FOR THE UNITED STATES AS APPELLEE
_____

VANITA GUPTA
  Principal Deputy Assistant
  Attorney General

MARK L. GROSS
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 514-9115
  Chris.Wang@usdoj.gov

Case No. 15-14117-EE

*United States* v. *Secretary, Florida Department of Corrections, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 - 26.1-3 and 27-1(a)(9), counsel

for appellee United States certifies that in addition to the persons and entities

identified in the defendants-appellants' brief, the following persons may have an

interest in the outcome of this case:

Camp, John A., Attorney, Carlton Fields, counsel for intervenors below

Christianson, Jennifer, Attorney, Carlton Fields, counsel for intervenors

below

Gupta, Vanita, Principal Deputy Assistant Attorney General, United States

Department of Justice, Civil Rights Division, counsel for the United States

The Honorable Patricia A. Seitz, Judge, United States District Court for the

Southern District of Florida


s/ Christopher C. Wang
CHRISTOPHER C. WANG
 Attorney

Date:  February 24, 2016

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States has no objection to defendants' request for oral argument in this case.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................2

STATEMENT OF THE CASE..................................................................................2

     1.    *Nature Of The Case* ....................................................................2

     2.    *Course Of Proceedings And Dispositions In The Court*
         *Below* ......................................................................................3

     3.    *Statement Of The Facts* ...........................................................5

         a.    *The FDOC's History Of Providing Kosher Meal Plans*.............5

         b.    *The FDOC's Implementation Of Its New RDP*..........................7

         c.    *Evidence On The RDP's Costs And Their Effect On*
             *The FDOC's Penological Interests*...........................................11

         d.    *The Decisions Below* ................................................................17

STATEMENT OF STANDARD OF REVIEW ......................................................22

SUMMARY OF ARGUMENT ..............................................................................22

**TABLE OF CONTENTS (continued):**                                    **PAGE**

ARGUMENT

I     THE DISTRICT COURT CORRECTLY GRANTED
      SUMMARY JUDGMENT TO THE UNITED STATES
      ON ITS CLAIMS THAT DEFENDANTS' BLANKET
      DENIAL OF KOSHER MEALS AND THE RDP'S
      ZERO-TOLERANCE AND TEN-PERCENT RULES
      VIOLATED RLUIPA ........................................................................26

      A.     Standards For Applying Section 3 ............................................26

      B.     The FDOC's Blanket Denial Of Kosher Meals Does
             Not Advance A Compelling Governmental Interest.................29

      C.     The FDOC's Blanket Ban On Kosher Meals Is Not
             The Least Restrictive Means Of Advancing A
             Compelling Governmental Interest...........................................44

      D.     The RDP's Zero-Tolerance And Ten-Percent
             Rules Are Not The Least Restrictive Means Of
             Advancing A Compelling Governmental Interest .....................49

II    THE DISTRICT COURT ACTED WITHIN ITS
      DISCRETION IN PERMANENTLY ENJOINING
      DEFENDANTS FROM DENYING KOSHER
      MEALS TO ALL PRISONERS WITH A SINCERE
      RELIGIOUS BELIEF FOR KEEPING KOSHER
      AND FROM ENFORCING THE ZERO-TOLERANCE
      AND TEN-PERCENT RULES...........................................................51

      A.     The United States Satisfied The Factors For
             Permanent Injunctive Relief In This Case .................................53

      B.     The District Court Satisfied The PLRA's
             Need-Narrowness-Intrusiveness Requirements
             In Entering A Permanent Injunction.........................................55

**TABLE OF CONTENTS (continued):**                                    **PAGE**

CONCLUSION ......................................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                                              **PAGE**

*Ashcroft* v. *American Civil Liberties Union*, 542 U.S. 656,
124 S. Ct. 2783 (2004)......................................................................29

*Beerheide* v. *Suthers*, 286 F.3d 1179 (10th Cir. 2002) ................................ 34-35, 41

*Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ........................*passim*

*Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
508 U.S. 520, 113 S. Ct. 2217 (1993) ............................................................31

*Coleman* v. *Jabe*, No. 7:11-cv-00578, 2013 WL 4084762
(W.D. Va. Aug. 13, 2013) ................................................................43

*\*Cutter* v. *Wilkinson*, 544 U.S. 709, 125 S. Ct. 2113 (2005) ..........................*passim*

*\*Davila* v. *Gladden*, 777 F.3d 1198 (11th Cir.),
cert. denied, 136 S. Ct. 78 (2015)............................................................*passim*

*Elrod* v. *Burns*, 427 U.S. 347, 96 S. Ct. 2673 (1976)...............................................54

*Ford* v. *Federal Bureau of Prisons*, No. 08-cv-00882,
2011 WL 2415790 (D. Colo. May 24, 2011) ......................................... 42-43

*Garner* v. *Kennedy*, 713 F.3d 237 (5th Cir. 2013)....................................................36

*Grutter* v. *Bollinger*, 539 U.S. 306, 123 S. Ct. 2325 (2003) ...................................37

*Harry* v. *Marchant*, 291 F.3d 767 (11th Cir. 2002)..................................................37

*Hathcock* v. *Cohen*, 287 F. App'x 793 (11th Cir. 2008) ................................... 36-37

*\*Holt* v. *Hobbs*, 135 S. Ct. 853 (2015) ...........................................................*passim*

*Johnson* v. *Breeden*, 280 F.3d 1308 (11th Cir. 2002)................................. 53, 56-57

**CASES (continued):** **PAGE**

*Johnson* v. *Governor of Fla.*, 405 F.3d 1214 (11th Cir.),
cert. denied, 546 U.S. 1015, 126 S. Ct. 650 (2005).......................................22

*Knight* v. *Thompson*, 723 F.3d 1275 (11th Cir. 2013),
reinstated in part and superseded in part by 797 F.3d 934 (11th Cir.
2015), petition for cert. pending, No. 15-999 (filed Feb. 4, 2016).......... 48-49

*\*Koger* v. *Bryan*, 523 F.3d 789 (7th Cir. 2008).......................................................31

*LaMarca* v. *Turner*, 995 F.2d 1526 (11th Cir. 1993),
cert. denied, 510 U.S. 1164, 114 S. Ct. 1189 (1994)....................................52

*Lewis* v. *S.S. Baune*, 534 F.2d 1115 (5th Cir. 1976)................................................53

*Lovelace* v. *Lee*, 472 F.3d 174 (4th Cir. 2006) .......................................................28

*McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334,
115 S. Ct. 1511 (1995)...................................................................................27

*\*Moussazadeh* v. *Texas Dep't of Crim. Justice*,
703 F.3d 781 (5th Cir. 2012) ...........................................................31, 34, 41

*Murphy* v. *Missouri Dep't of Corr.*, 372 F.3d 979 (8th Cir.),
cert. denied, 543 U.S. 991, 125 S. Ct. 501 (2004).................................. 50-52

*Native Am. Council of Tribes* v. *Weber*, 750 F.3d 742 (8th Cir. 2014).............46, 50

*Opulent Life Church* v. *City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) .......................................................................54

*Patel* v. *United States Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008) ...............42

*Patton* v. *Triad Guar. Ins. Corp.*, 277 F.3d 1294 (11th Cir. 2002) ........................22

*Procunier* v. *Martinez*, 416 U.S. 396, 94 S. Ct. 1800 (1974),
overruled on other grounds by *Thornburgh* v. *Abbott*,
490 U.S. 401, 109 S. Ct. 1874 (1989) ...........................................................44

**CASES (continued):**                                                    **PAGE**

*Rich* v. *Buss*, No. 1:10-cv-00157, 2012 WL 694839
　　(N.D. Fla. Jan. 12, 2012) ...............................................................36

*\*Rich* v. *Secretary, Fla. Dep't of Corr.*, 716 F.3d 525 (11th Cir. 2013)..........*passim*

*Sherbert* v. *Verner*, 374 U.S. 398, 83 S. Ct. 1790 (1963).......................................29

*\*Spratt* v. *Rhode Island Dep't of Corr.*, 482 F.3d 33 (1st Cir. 2007) ......... 31-32, 46

*Thomas* v. *Bryant*, 614 F.3d 1288 (11th Cir. 2010)............................... 22, 51-52, 54

*Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987)............................................37

*United States* v. *Alabama*, 691 F.3d 1269 (11th Cir. 2012),
　　cert. denied, 133 S. Ct. 2022 (2013)..............................................................54

*United States* v. *Hardman*, 297 F.3d 1116 (10th Cir. 2002) ...................................29

*United States* v. *Secretary, Fla. Dep't of Corr.*,
　　778 F.3d 1223 (11th Cir. 2015) .......................................................................4

*Warsoldier* v. *Woodford*, 418 F.3d 989 (9th Cir. 2005) ...................................*passim*

*Washington* v. *Klem*, 497 F.3d 272 (3d Cir. 2007)...................................... 32, 50-51

*Wesley* v. *City of New York*, No. 05-cv-5833, 2012 WL 3262749
　　(S.D.N.Y. Aug. 10, 2012)...............................................................................43

*Willis* v. *Commissioner, Ind. Dep't of Corr.*, 753 F. Supp. 2d 768
　　(S.D. Ind. 2010) .............................................................................................36

*Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972).......................................27

*Yellowbear* v. *Lampert*, 741 F.3d 48 (10th Cir. 2014) ...........................................28

*Yisrael* v. *Beasley*, No. 5:08-ct-3079, 2012 WL 2919984 (E.D.N.C. July 17,
　　2012), aff'd 516 F. App'x 360 (4th Cir. 2013)......................................... 43-44

**CASES (continued):**                                                    **PAGE**

*Young* v. *McNeil*, No. 4:08-cv-44, 2009 WL 2058923
    (N.D. Fla. July 13, 2009) .............................................................. 5-6

## STATUTES:

Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA),
    42 U.S.C. 2000cc *et seq.* ...................................................................1
    42 U.S.C. 2000cc-1(a) ..................................................2, 23, 26
    42 U.S.C. 2000cc-1(b)(1) ...............................................................29
    42 U.S.C. 2000cc-2(b) ...................................................................26
    42 U.S.C. 2000cc-2(e) ....................................................................52
    42 U.S.C. 2000cc-2(f) .......................................................................1
    42 U.S.C. 2000cc-3(c) ..............................................................33, 36
    42 U.S.C. 2000cc-3(g) ...................................................................55
    42 U.S.C. 2000cc-5(2) ...................................................................26

18 U.S.C. 3626(a)(1)(A) ...........................................................................52

28 U.S.C. 1291 ............................................................................................2

28 U.S.C. 1331 ............................................................................................1

28 U.S.C. 1345 ............................................................................................1

## LEGISLATIVE HISTORY:

S. Rep. No. 111, 103d Cong., 1st Sess. (1993) ......................................27

146 Cong. Rec. 16,699 (2012) ................................................................27

## RULES:

Fed. R. Civ. P. 60(b) ...............................................................................41

## MISCELLANEOUS:

Federal BOP, *Program Statement*, Religious Beliefs and Practices 19,
    http://www.bop.gov/policy/progstat/5360_009.pdf ......................16

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 15-14117-EE

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS;
FLORIDA DEPARTMENT OF CORRECTIONS,

Defendants-Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

BRIEF FOR THE UNITED STATES AS APPELLEE
_____

**STATEMENT OF JURISDICTION**

The United States brought this suit against defendants, the Secretary of the

Florida Department of Corrections (Secretary) and the Florida Department of

Corrections (FDOC or Department), to enforce the Religious Land Use and

Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc *et seq.*,

pursuant to 42 U.S.C. 2000cc-2(f).  The district court had jurisdiction under 28

U.S.C. 1331, 1345.  On April 30, 2015, the district court issued an order granting

in part the United States' motion for summary judgment.  On August 12, 2015, the

district court entered a final judgment and a permanent injunction.  Defendants

filed a timely notice of appeal on September 11, 2015.  This Court has jurisdiction

under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.  Whether the FDOC's denial of a kosher diet for prisoners with a sincere

religious belief for keeping kosher and enforcement of the Religious Diet Plan's

zero-tolerance and ten-percent rules violated RLUIPA.

2.  Whether the district court acted within its discretion in entering a

permanent injunction ordering defendants to provide a kosher diet to prisoners with

a sincere religious belief for keeping kosher and enjoining the Religious Diet

Plan's zero-tolerance and ten-percent rules.

## STATEMENT OF THE CASE

*1.    Nature Of The Case*

This is an appeal from the district court's order of declaratory and permanent

injunctive relief in a case the federal government brought against defendants to

enforce Section 3 of RLUIPA.  That Section prohibits state and local governments

from imposing "a substantial burden on the religious exercise of a person residing

in or confined to an institution" unless the government shows that the burden

furthers "a compelling governmental interest" and does so by "the least restrictive

means."  42 U.S.C. 2000cc-l(a).  The statute thus establishes "very broad

- 3 -

protection for religious liberty," *Holt* v. *Hobbs*, 135 S. Ct. 853, 859 (2015)

(quoting *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)), that

"protects institutionalized persons who are unable freely to attend to their religious

needs and are therefore dependent on the government's permission and

accommodation for exercise of their religion," *Cutter* v. *Wilkinson*, 544 U.S. 709,

721, 125 S. Ct. 2113, 2122 (2005).

2.      *Course Of Proceedings And Dispositions In The Court Below*

On August 14, 2012, the United States filed a complaint for declaratory and

injunctive relief in the Southern District of Florida, alleging that the FDOC's

refusal to offer kosher meals violated the rights of hundreds of its prisoners under

RLUIPA.  Doc. 1.[1]  While mediation was ongoing, defendants adopted a new

Religious Diet Program (RDP) procedure on March 22, 2013.  Doc. 29 at 4-5.  The

RDP would offer a kosher diet in most FDOC facilities by September 2013, but

imposed several conditions on participation that the United States believed violated

RLUIPA.  Doc. 29-8.

In April 2013, the United States moved for a preliminary injunction seeking

an order requiring defendants to provide kosher meals to all prisoners with a

sincere religious belief for keeping kosher, and enjoining the implementation of the

---

[1]  This brief uses the following abbreviations:  "Doc. __ at __" refers to the document number assigned on the district court's docket sheet and "Br. __" for defendants' opening brief filed with this Court.

- 4 -

aspects of the RDP that the United States asserted violated RLUIPA.  Doc. 29.  On

December 6, 2013, the district court issued an order granting the United States'

motion for a preliminary injunction.  Doc. 106.  The district court ordered

defendants to provide a certified kosher diet to all prisoners with a sincere religious

belief for keeping kosher no later than July 1, 2014, and preliminarily enjoined

them from implementing provisions of the RDP that violated RLUIPA.  Doc. 106

at 31-32.  Defendants filed an interlocutory appeal from the district court's order.

Doc. 120.  Before the appeal could be heard, this Court dismissed the appeal as

moot due to the failure of the district court's injunction to comply with the Prison

Litigation Reform Act of 1995 (PLRA).  *United States* v. *Secretary, Fla. Dep't of

Corr.*, 778 F.3d 1223 (11th Cir. 2015).

In February 2015, both sides moved for summary judgment in the district

court.  Doc. 442-443.  On April 30, 2015, the district court issued an order granting

the United States' motion in part and defendants' motion in part.  Doc. 498.  On

August 12, 2015, the district court issued a final judgment and permanent

injunction.  Doc. 547-548.  The district court ordered defendants to offer a kosher

diet to all prisoners with a sincere religious belief for keeping kosher and

permanently enjoined them from enforcing certain rules and policies in the RDP

that the court determined violated RLUIPA.  Doc. 498 at 30-31; Doc. 548 at 2-3.

This appeal followed.

- 5 -

3.      Statement Of The Facts

a.      The FDOC's History Of Providing Kosher Meal Plans

The FDOC incarcerates approximately 100,000 prisoners in over 60 facilities.  Doc. 487 at 1; Doc. 498 at 3.  The FDOC receives federal funds and thus is subject to RLUIPA.  Doc. 487 at 1; Doc. 498 at 3.  Among the FDOC's inmates are individuals with a sincere religious belief in keeping kosher.  Doc. 487 at 1; Doc. 498 at 3.

Prior to 2004, the FDOC did not offer a kosher diet to any prisoners.  Doc. 487 at 2; Doc. 498 at 3.  In 2004, the FDOC adopted a kosher meal program known as the Jewish Dietary Accommodation Program (JDAP) after settling a lawsuit brought by a Jewish prisoner.  See *Cotton* v. *Department of Corr.*, No. 1:02-cv-22760 (S.D. Fla.); Doc. 443-1 at 36; Doc. 487 at 2; Doc. 498 at 3.  The FDOC offered the JDAP in 13 of its facilities, and prisoners eligible to participate in the program were transferred to one of these facilities.  Doc. 67 at 29-30; Doc. 68 at 114; Doc. 487 at 2; Doc. 498 at 3.  Although the JDAP was initially open only to Jewish prisoners, in 2006 the FDOC opened the program to prisoners of all faiths.  Doc. 68 at 86, 88; Doc. 487 at 2; Doc. 498 at 3.

In August 2007, the FDOC terminated the JDAP due to several alleged security issues, primarily connected to transferring prisoners to the 13 JDAP facilities.  See *Young* v. *McNeil*, No. 4:08-cv-44, 2009 WL 2058923, at *2-3 (N.D.

Fla. July 13, 2009); Doc. 52 at 2; Doc. 487 at 2; Doc. 498 at 3.  The FDOC made

this decision against the advice of its own Study Group on Religious Dietary

Accommodation in Florida's State Prison System.  That Study Group advised the

FDOC that discontinuing the program would violate RLUIPA, because a prisoner

desiring to keep kosher "is substantially burdened" by the denial of kosher food

and "it is improbable that [the FDOC] can satisfy a court's inquiry into whether the

department is furthering a compelling interest, let alone that denying inmates'

religious accommodation is the least restrictive means available."  Doc. 29 at 3

(citation omitted); Doc. 67 at 55; Doc. 106 at 3.

In August 2010, the FDOC initiated a pilot kosher diet program (Pilot

Program) at the South Unit of the South Florida Reception Center (SFRC) near

Miami.  Doc. 29 at 3; Doc. 29-4; Doc. 67 at 44, 56; Doc. 487 at 2; Doc. 498 at 3.

In contrast to the JDAP, which averaged approximately 250 prisoners per day, the

Pilot Program began with 11 prisoners and has accommodated between 8 and 18

prisoners during its operation.  Doc. 29 at 3; Doc. 29-4; Doc. 67 at 56, 152; Doc.

68 at 88; Doc. 487 at 2; Doc. 498 at 3.  The FDOC agreed in October 2010 to

expand the Pilot Program, but never did so.  Doc. 67 at 58-59; Doc. 68 at 13; Doc.

106 at 4; Doc. 443-1 at 37-38; Doc. 443-4 at 58-59.

Thus, from 2007 to 2013, the FDOC did not offer a kosher diet to any

prisoners except for the small number of participants in the Pilot Program at the

SFRC.  Doc. 67 at 56; Doc. 106 at 4.  During this time, defendants offered the following diet options to inmates:  (1) mainline meal; (2) vegan meal; (3) alternative, non-meat option to the mainline entrée; and (4) medical diets as prescribed by FDOC personnel.  Doc. 487 at 2; Doc. 498 at 3-4.  None of these diets are kosher.  Doc. 487 at 2; Doc. 498 at 4.

    In May 2011, the United States Department of Justice opened a formal investigation into the FDOC's food operations.  Doc. 29 at 4; Doc. 29-5.  The investigation concluded that the FDOC could provide a kosher diet consistent with its penological interests, and that its failure to do so violated RLUIPA.  Doc. 29 at 4.  The United States notified the FDOC of its conclusion on August 1, 2012, and offered to negotiate a mutually agreeable plan.  Doc. 29 at 4; Doc. 29-7.  The FDOC rejected the offer to negotiate, and so the United States filed suit on August 14, 2012.  Doc. 29 at 4.

    *b.*      *The FDOC's Implementation Of Its New RDP*

    Defendants presented the RDP proposal to the United States during mediation on March 4, 2013 (Doc. 29 at 4-5), and presented a revised proposal on March 20, 2013 (Doc. 29 at 5).  Shortly thereafter – while the parties were still negotiating and without notifying the United States – defendants issued the new RDP policy, Procedure 503.006, which they pledged to implement statewide by September 2013.  Doc. 29 at 5; Doc 29-8 at 2; Doc. 67 at 46-47; Doc. 487 at 2;

- 8 -

Doc. 498 at 4.  In place of the JDAP's requirement that a separate kosher kitchen

be constructed, the original CFO[2] consisted of shelf-stable, double-wrapped,

prepackaged, certified kosher entrees, as well as kosher items from the FDOC's

normal food service operations.  Doc. 67 at 48, 54, 111; Doc. 106 at 7; Doc. 498 at

5 n.6.

The RDP imposed several provisions limiting prisoner participation.  The

RDP required, as a threshold matter, that a participant pass a "sincerity test[]" that

examines the prisoner's "basic knowledge of the religion and the requirements of

keeping a religious diet."  Doc. 29-8 at 5; Doc. 67 at 148; Doc. 68 at 54, 92.  The

new RDP also established several bases for removing prisoners from the CFO.

They included a prisoner missing more than ten percent of the kosher meals (the

ten-percent rule), bartering a kosher food item for a non-kosher food item (the anti-

bartering policy), or consuming a single item from the cafeteria or the canteen that

FDOC officials deem not to be kosher (the zero-tolerance rule).  Doc. 29-8 at 7-8;

Doc. 67 at 122, 143-144, 150; Doc. 68 at 57-58, 99, 107; Doc. 498 at 5-6.  The

policy made these removals mandatory and required the prisoner to seek

reinstatement through the prison's grievance process, rather than providing him the

---

[2]  The RDP's kosher meal program is known as the certified food option
(CFO).  See Doc. 67 at 107-108.

- 9 -

opportunity to explain the circumstances of his actions before removal.  Doc. 29-8 at 8; Doc. 67 at 155-156; Doc. 68 at 99-101; Doc. 498 at 6.

The first facility to implement the RDP was Union Correctional Institution (UCI), which began serving kosher meals on July 1, 2013.  Doc. 67 at 47, 119; Doc. 68 at 70; Doc. 487 at 2; Doc. 498 at 7.  Although defendants initially planned to expand the RDP statewide by September or October 2013 (Doc. 67 at 47-48, 120-121; Doc. 106 at 7), they subsequently decided to implement the RDP only gradually, starting with four additional facilities by March 2014 (Doc. 487 at 3). After the district court entered a preliminary injunction requiring defendants to provide a kosher diet statewide by July 1, 2014 (Doc. 106 at 31; Doc. 498 at 4), defendants asked the court to delay this deadline by an additional year (Doc. 327 at 1-2).  The district court ordered a modified timeline, with full implementation of the RDP in all FDOC facilities by April 2015.  Doc. 487 at 3; Doc. 498 at 7.  The FDOC met this deadline and is serving kosher meals in all of its major facilities.[3]

FDOC officials believed that gradual implementation of the RDP would allow the FDOC to predict future participation trends.  Doc. 443-7 at 5; Doc. 443-9 at 10-11.  From April 2014 to April 2015, the number of prisoners approved for the RDP in the first five facilities serving kosher meals decreased from over 3200 to

---

[3]  Monthly reports the FDOC files with the district court give details on participation across all FDOC facilities, and thus show that defendants have fully implemented the RDP.  See, *e.g.*, Doc. 588-1.

approximately 1157.  Doc. 487 at 2-3.  This decline is similar to the experience of

the Federal Bureau of Prisons (BOP), which saw an initial spike in participation

when it first implemented a kosher diet option, followed by a decline to the current

rate of 1-2% participation in the program.  Doc. 443-17 at 7-8.  One of the United

States' experts opined that he expected participation rates in the RDP to drop

"significantly over time" to the range experienced by the Federal BOP once the

novelty of the kosher meal wore off and prisoners realized the kosher diet's limited

variety compared to the mainline meal.  Doc. 443-17 at 14-16.  FDOC officials

also expected to see declines at all institutions after the RDP had been in place for

some time.  Doc. 443-9 at 10-11; Doc. 443-10 at 3; Doc. 498 at 7.

The record showed that the Federal BOP has offered a kosher meal program

system-wide for two decades.  Doc. 67 at 83; Doc. 68 at 121; Doc. 443-8 at 8; Doc.

443-17 at 7-8; Doc. 443-28 at 3-4.  The Federal BOP currently administers a

"Certified Religious Menu" open to all religious faiths in all of its facilities, which

enrolls approximately one percent of the prison population.  Doc. 49-14; Doc. 56-1

at 9; Doc. 68 at 134-136, 141; Doc. 443-28 at 7-8, 15; Doc. 443-31 at 4.  In

addition to the Federal BOP, at least 35 state departments of corrections, including

those in New York, California, Texas, and Illinois, offer kosher meals to inmates.

Doc. 49-16; Doc. 56-1 at 9.

- 11 -

    *c.*    *Evidence On The RDP's Costs And Their Effect On The FDOC's*
          *Penological Interests*

    i.  The FDOC's operating budget for fiscal year 2013-2014 was
approximately $2.1 billion.  Doc. 487 at 1.  For fiscal year 2014-2015, the Florida
legislature increased that amount to approximately $2.3 billion.  Doc. 487 at 1.
The Florida legislature increased the FDOC's food budget for fiscal year 2014-
2015 by over $1 million, to a total of between $54 and $55 million, and provided
over $23 million to offset the FDOC's existing budget deficit.  Doc. 255-1 at 1-2;
Doc. 487 at 1.  The additional funds budgeted to the FDOC allowed it to give
raises to its employees and hire additional certified security officers.  Doc. 443-7 at
3-4.

    The FDOC's food service operation is not limited to the amount allocated
for the fiscal year.  Instead, the FDOC is capable of transferring money to its food
budget from other budget categories.  Doc. 443-7 at 8.  Indeed, FDOC Budget
Director Mark Tallent testified that, in the second half of the year, he transfers
money between different budget categories, including food service, "several
[times] a week."  Doc. 443-7 at 9-10.

    When defendants first implemented the RDP, they calculated that its
prepackaged meals would cost the FDOC approximately an extra $5.81 per
prisoner each day.  Doc. 67 at 114-115.  In 2014, defendants replaced the CFO's
prepackaged meal with cold meals (Doc. 498 at 5 n.6), resulting in a significant

- 12 -

drop in costs for the kosher meal. As of April 2015, the kosher meal costs $3.554 per inmate per day; the daily cost of the mainline meal is $1.888 per inmate. Doc. 487 at 4; Doc. 498 at 10.

The United States estimated that once defendants have fully implemented the RDP, the FDOC's marginal annual cost will be between $384,000 (assuming a long-term participation rate of one percent, comparable to the Federal BOP's program) and $3.32 million (assuming a participation of around 8700 prisoners, the approximate number of participants at the time of the briefing below). Doc. 487 at 4. The United States based these calculations on the difference in the cost between the kosher meal and the mainline meal, which it determined was $1.06 per inmate per day. Doc. 487 at 4. This calculation accounted for the rates at which prisoners actually picked up mainline and kosher meals, because the rate of meal preparation and pickup within the FDOC is tracked and is significantly lower than 100%, with mainline pickup at about 85% and kosher diet pickup at about 75%. Doc. 442-3 at 23; Doc. 443-1 at 7; Doc. 487 at 4. The marginal cost of the kosher diet is similar to the cost of defendants' medical and therapeutic diets, which ranges from $2.00 to $3.05 per day for each of the approximately 3600 prisoners on those diets. Doc. 443-1 at 11, 15; Doc. 487 at 2, 4.

By contrast, defendants estimated that the total annual cost of the RDP would range between $884,741 (one percent participation) and $5.5 million (the

participation of approximately 8700 prisoners). Doc. 442-5 at 8-12; Doc. 487 at 4.

Defendants did not factor in pickup rates in making these calculations; they budget

for 100% participation, notwithstanding that food service directors actually order

and prepare food based on known, lower participation rates. Doc. 443-1 at 7-8, 26;

Doc. 487 at 4-5.

Defendants projected that the RDP could cost as much as $12.3 million per

year in a "worst-case scenario." Doc. 442-5 at 13; Doc. 443-7 at 6; Doc. 443-16;

Doc. 487 at 5. Defendants based this figure on several calculations and

assumptions, including the following:

- The RDP will include nearly 8200 inmates long-term, each with a 100% participation rate. This despite the fact that, on average, RDP prisoners pick up only 75% of their meals. Doc. 442-3 at 23; Doc. 443-9 at 9.

- The FDOC will hire two additional full-time food service staff and one additional full-time chaplain at every major facility to implement the RDP. Doc. 442-1 at 66; Doc. 442-5 at 14; Doc. 443-9 at 5, 21. The entire cost of these staff members is charged to the RDP regardless of whether the staff members devote all of their time to the RDP. Doc. 442-1 at 45, 49; Doc. 443-9 at 22-24; Doc. 443-10 at 5-6; Doc. 443-16; Doc. 498 at 9.

- The FDOC will make technology investments in scanners, laptops, and servers to track prisoner participation in meals. The entire cost of these investments is allotted to the RDP, even though the equipment is also used for tracking mainline meal participation. Doc. 442-5 at 8-13; Doc. 443-9 at 6; Doc. 443-16; Doc. 498 at 9.

- The FDOC will use farm produce to reduce its food costs, but will allocate all savings to the mainline and none to the RDP. Farm savings are used to offset the cost of the mainline menu by $0.10 to

- 14 -

$0.20 per day.  Doc. 443-1 at 7 (savings between $0.10 and $0.15);
Doc. 443-9 at 13-15 (savings between $0.18 and $0.20).

ii.  Costs notwithstanding, defendants have taken the position throughout this litigation that the FDOC can provide a statewide kosher meal plan consistent with its penological interests.  At the June 2013 preliminary injunction hearing, FDOC's designated security expert James Upchurch acknowledged that it was "fair to say" that the FDOC had determined that it could "provide a statewide kosher diet plan consistent with its interests."  Doc. 67 at 52.  He also conceded that the FDOC "has been able to successfully manage any issues relat[ing] to providing these special diets [such as vegan, medical, and therapeutic] to certain prisoners for at least a number of years."  Doc. 67 at 60.  Jon Creamer, FDOC's Chief Procurement Officer and the State's most knowledgeable witness on food cost issues, acknowledged that the FDOC is "committed" to providing the current kosher diet and that this diet is "sustainable for the [FDOC] going forward."  Doc. 443-5 at 12.  FDOC's budget expert Shane Phillips similarly believed that the current kosher menu "is a sustainable model."  Doc. 443-1 at 24.  FDOC's Operations Management Consultant Kenneth Anguish agreed that the FDOC is "committed to providing kosher meals" and "[has] come up with a way that this program could be sustainable."  Doc. 443-6 at 6.

The evidence bears out these beliefs.  During the time the RDP has been offered, FDOC officials testified, the FDOC has not had to discontinue any

programs because of the RDP's costs.  Doc. 442-3 at 108; Doc. 443-7 at 12.

Phillips elaborated that he is not aware of any lay-offs that have occurred because

of the RDP's cost.  Doc. 442-3 at 108.  Echoing his earlier preliminary injunction

testimony, Upchurch testified that he was not aware of any significant security

incident related to a kosher diet at any correctional facility in the United States.

Doc. 443-14 at 6.  FDOC Security Bureau Chief Carl Wesley Kirkland, Jr.

similarly testified that he was not aware of any assaults or other significant

incidents related to the RDP since its inception.  Doc. 443-24 at 3-4.  SFRC

Warden Jose Colon testified that the pilot kosher program has not raised security

issues during his tenure.  Doc. 443-22 at 11.  Likewise, the UCI staff has safely

administered the RDP since its inception in July 2013.  Doc 443-23 at 12.

 iii.  The zero-tolerance rule states that a prisoner will be removed from the

CFO for consuming a single item from the cafeteria or the canteen that FDOC

officials deem not to be kosher.  Phillips acknowledged at the preliminary

injunction hearing that the FDOC had not conducted a full analysis of, and did not

know, whether removing a prisoner from the CFO for 30 days for a single act of

consuming a non-kosher item would save the FDOC money.  Doc. 67 at 144.

Defendants subsequently conceded that they can provide an opportunity for

prisoners to explain their canteen selections prior to suspension from the RDP,

consistent with the FDOC's penological interests.  Doc. 246 at 5-6.  Indeed, the

FDOC has long given this opportunity to prisoners on its vegan and medical diets

(Doc. 443-1 at 33-34; Doc. 443-32 at 3-6), as has the Federal BOP for prisoners in

its kosher-meal program, Federal BOP, *Program Statement*, Religious Beliefs and

Practices 19, http://www.bop.gov/policy/progstat/5360_009.pdf.

iv.  The ten-percent rule states that a prisoner will be removed from the CFO

for missing more than ten percent of kosher meals.  Upchurch and Phillips both

testified at the preliminary injunction hearing that this rule's purpose is to save

costs on meals that are prepared and discarded because they are not eaten.  Neither

attempted, however, to quantify the magnitude of this alleged waste or the amount

of money this rule would save the FDOC.  Doc. 67 at 49, 156-157.  Phillips further

testified that he did not analyze the cost savings of this rule.  Doc. 443-1 at 28-30.

Indeed, evidence presented to the district court shows that any cost savings from

the ten-percent rule are negligible.  Under the current RDP, FDOC officials track

inmate participation in meals and prepare food based on the number of prisoners

they expect to eat at a given meal, allowing the Department to avoid any waste

associated with preparing kosher meals for prisoners who do not show up.  Doc.

443-1 at 7-8, 26-27; Doc. 443-5 at 3; Doc. 443-27 at 5-8.  Furthermore, the FDOC

food service staff use "progressive preparation" techniques, assembling meals only

as they are needed.  Doc. 443-9 at 3; Doc. 443-27 at 9-11.  The staff saves unused

- 17 -

cold items, such as the peanut butter and sardine packets used in the RDP, and uses them for later meals. Doc. 443-9 at 3-4.

    *d.    The Decisions Below*

    Both parties moved for summary judgment. On April 30, 2015, the district court issued an order (the Summary Judgment Order) granting in part and denying both motions in part. Doc. 498. The district court held that RLUIPA requires defendants to provide kosher meals to all prisoners with a sincere religious belief, rejecting defendants' claim to have a compelling state interest in cost containment that justifies denying kosher meals. The court stated that defendants' voluntary provision of kosher meals, and their repeated representations that they are committed to providing kosher meals and that the RDP is sustainable, "substantially dampened" their claimed interest in cost containment. Doc. 498 at 16-17. Indeed, the district court determined that defendants failed to show that containing the costs associated with the RDP would further *any* compelling state interest, in light of the lack of "evidence that any programs have been cut, that any staff has been cut, or that there has been any harm to any aspect of Defendants' operations." Doc. 498 at 17-18. The district court further observed that the total cost of the RDP was a "relatively small" amount in an overall budget of nearly $2.3 billion per year. Doc. 498 at 15-16.

- 18 -

The court rejected defendants' arguments that providing kosher meals is a policy decision that RLUIPA gives the State the discretion to make for itself. First, the court concluded that defendants' emphasis on the statement in RLUIPA's legislative history calling for courts to defer to the experience and expertise of prison administrators "cannot be reconciled with the language of the statute, which makes clear that RLUIPA may override some state fiscal policy decisions." Doc. 498 at 18. Next, the court found that defendants' contention that they must have the freedom to discontinue the RDP if a fiscal crisis occurs in the future to be "based on speculation about future possibilities," which does not create a current compelling interest. Doc. 498 at 19. Finally, the court rejected defendants' attempt to distinguish the FDOC from the Federal BOP and most major state prison systems that offer kosher meals to prisoners, holding that defendants failed to explain how their alleged budgetary issues differ from those faced by these many other prison systems. Doc. 498 at 19-20.

The district court then found that even if cost containment were a compelling state interest, defendants failed to show that an outright denial of kosher meals was the least restrictive means of achieving that interest. The court determined that the record evidence, which included defendants beginning to provide kosher meals to prisoners and not having to cut any programs, belied their claim that their budget crisis justified a blanket denial of kosher meals. Doc. 498

at 20-21.  The district court observed that defendants had available tools in the

RDP itself to reduce participation rates by inmates who should not be entitled to

kosher meals short of eliminating all kosher meals.  Doc. 498 at 21.

The district court concluded that the United States satisfied the "need-

narrowness-intrusiveness" requirements of the PLRA, and therefore was entitled to

a permanent injunction requiring defendants to provide kosher meals to those

prisoners with a sincere religious belief requiring such meals.  Doc. 498 at 22-23.

The court held that defendants' years-long denial of kosher meals, and their

continued insistence that they are free to stop providing these meals at any time,

demonstrated the need for the requested injunction.  Doc. 498 at 22.

The court then determined that requiring defendants to provide kosher meals

to prisoners whose sincere religious belief requires them "is the most narrowly

drawn way of achieving that goal" because "[i]t limits to whom Defendants must

provide the meals and does not attempt to accomplish anything other than to

remedy the RLUIPA violation."  Doc. 498 at 22.  Finally, the court concluded that

because the injunction leaves defendants the freedom to craft the particular details

of its kosher-meal plan, "it would also be the least intrusive means of

accomplishing the goal" that "would reach no further than necessary to correct the

RLUIPA violation."  Doc. 498 at 22-23.  The court also observed that "there is no

evidence in the record, and no arguments have been made, that such an injunction

would have any effect on public safety or the operation of FDOC."  Doc. 498 at 23.

Turning to specific provisions in the RDP, the district court held that the

RDP's zero-tolerance rule violated RLUIPA.  The court found that automatic

suspension of a prisoner's kosher meals before he has an opportunity to explain the

circumstances behind the alleged violation of the RDP rules imposes a substantial

burden on the prisoner's religious exercise by forcing him, "during the grievance

process, to choose between violating his religious beliefs or not eating."  Doc. 498

at 23.  The court then determined that defendants failed to show that the zero-

tolerance policy and post-suspension grievance process were the least restrictive

means of achieving a compelling state interest.  Doc. 498 at 24.  The court

observed that defendants failed to introduce any record evidence indicating how

much money they would save by immediately suspending violators, or how much

manpower would be used by a pre-suspension investigation compared to the

current post-suspension grievance process.  Doc. 498 at 24-25.  Moreover, the

court noted, defendants currently conduct pre-suspension counseling and

investigation for the nearly 5000 prisoners on medical and vegan diets, indicating

they have a less restrictive means of achieving cost containment for those who

violate the rules of any dietary program.  Doc. 498 at 25.

- 21 -

The district court applied a similar analysis in concluding that the RDP's ten-percent rule violates RLUIPA. Doc. 498 at 26. As with the zero-tolerance rule, the court found that the ten-percent rule imposed a substantial burden on a prisoner's religious exercise by forcing him "to decide between violating [his] beliefs or not having [his] food needs met," and that defendants failed to introduce any evidence showing how this rule served their claimed interests in containing costs. Doc. 498 at 26-27. The court also observed that defendants already use other methods to avoid waste, such as tracking meal participation rates to calibrate food orders, progressively preparing meals, and reusing unused meal components. Doc. 498 at 27. Because defendants failed to show how these cost-savings measures are less effective than the ten-percent rule, the court concluded, they failed to show that the latter is the least restrictive means of advancing a compelling state interest. Doc. 498 at 27.[4]

On August 12, 2015, the district court issued a final judgment and permanent injunction (Final Judgment). Doc. 548. The Final Judgment entered declaratory judgment in the United States' favor on the United States' claims challenging defendants' denial of a kosher diet to religiously sincere prisoners, the

---

[4] The district court granted summary judgment to defendants on the issue of whether the RDP's anti-bartering policy is valid after the United States conceded the policy's validity. Doc. 498 at 2 n.3. The district court also held that defendants' doctrine sincerity testing did not violate RLUIPA. Doc. 498 at 28-30. Neither issue is on appeal here.

- 22 -

ten-percent rule, and the zero-tolerance rule.  Doc. 548 at 2.  The Final Judgment

also entered a permanent injunction ordering defendants "to offer a kosher diet, as

defined herein, to all prisoners with a sincere religious belief for keeping kosher";

and enjoining defendants from enforcing the ten-percent rule, the zero-tolerance

rule, "and any policy that suspends prisoners from the kosher diet without first

providing an opportunity for the prisoners to contest their removal or suspension."

Doc. 548 at 3.

## STATEMENT OF STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment de novo,

'viewing the record and drawing all reasonable inferences in the light most

favorable to the non-moving party.'"  *Johnson* v. *Governor of Fla.*, 405 F.3d 1214,

1217 (11th Cir.) (quoting *Patton* v. *Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296

(11th Cir. 2002)), cert. denied, 546 U.S. 1015, 126 S. Ct. 650 (2005).  This Court

reviews a district court's entry of a permanent injunction for abuse of discretion.

See *Thomas* v. *Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010).

## SUMMARY OF ARGUMENT

The district court correctly granted the United States summary judgment on

its claims that the FDOC's blanket ban on a kosher diet, and the RDP's ten-percent

and zero-tolerance rules violated Section 3 of RLUIPA.  The district court found,

and defendants do not dispute, that the United States satisfied its burden of proving

- 23 -

that the blanket ban and these provisions of the RDP "substantially burden[ed]" the religious exercise of FDOC inmates who have a sincere belief that their faith requires kosher meals.  42 U.S.C. 2000cc-1(a).

After the United States satisfied its burden of proof under Section 3, the burden of proof shifted to defendants to show that their policies not only further "a compelling governmental interest," but do so by "the least restrictive means."  42 U.S.C. 2000cc-1(a).  The district court correctly held, based on two factors, that defendants did not show that the FDOC's blanket denial of a kosher diet furthers compelling governmental interests.  First defendants have demonstrated that they can provide the RDP consistent with their interests by voluntarily implementing the RDP and conceding that the program is "sustainable."  Second, the district court correctly held that a blanket denial of a kosher diet did not further a compelling need for cost containment because the State did not demonstrate that the cost of the diet would negatively impact the Department.  Furthermore, the court held, the ability of comparably sized correctional institutions to offer a kosher diet, and the FDOC's failure to distinguish its operations from the operations of these institutions, also demonstrate that the FDOC's blanket denial of a kosher diet is not the least restrictive means to further the cost interests it asserts.

The district court correctly concluded that defendants failed to show that the zero-tolerance and ten-percent rules are the least restrictive means of advancing a

compelling governmental interest.  Defendants failed to present any evidence that the zero-tolerance rule furthered the interest in containing costs, and conceded that they could utilize the less restrictive alternative the Federal BOP employs, and the FDOC employs in suspending inmates from the vegan and medical diets, that gives inmates the opportunity to explain the circumstances of his consumption of a non-kosher item before meals are denied.  Defendants also failed to present any evidence of the costs the ten-percent rule would save, and the evidence before the district court indicated that the less-restrictive alternatives of tracking inmate participation in the RDP and preparing meals as they are needed saves even more money than enforcement of this rule.

In light of these holdings, the district court acted well within its discretion in entering a permanent injunction ordering defendants to provide a kosher meal to all prisoners with a sincere religious belief in keeping kosher and enjoining defendants from enforcing the ten-percent and zero-tolerance rules.  The permanent injunctive relief is tied precisely to the findings of statutory violations, and will ensure that prisoners with a sincere religious belief in keeping kosher will not, in the future, have to choose between not eating and violating their faith.  The public interest weighs heavily in favor of the district court's injunction, as RLUIPA passed both houses of Congress unanimously as "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-

imposed burdens." *Cutter* v. *Wilkinson*, 544 U.S. 709, 714, 125 S. Ct. 2113, 2117 (2005).

The court's permanent injunction also satisfied the requirement of this Court and the PLRA that the district court make express findings that injunctive relief is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of the federal right. With regard to defendants' blanket denial of kosher meals, the court found that there was a need for the injunction because defendants have long maintained that RLUIPA gives them to freedom to stop providing these meals at any time. The court also determined that the injunction was sufficiently narrow because it was limited to remedying the precise RLUIPA violations, and was the least intrusive means of accomplishing that goal because it leaves defendants free to craft their own solution related to providing kosher meals.

# ARGUMENT

# I

## THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE UNITED STATES ON ITS CLAIMS THAT DEFENDANTS' BLANKET DENIAL OF KOSHER MEALS AND THE RDP'S ZERO-TOLERANCE AND TEN-PERCENT RULES VIOLATED RLUIPA

A.    *Standards For Applying Section 3*

Section 3 of RLUIPA prohibits state and local governments from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means."  42 U.S.C. 2000cc-1(a).  Under Section 3, the United States bore the initial burden to show that the FDOC's blanket ban on a kosher diet and the RDP's zero-tolerance and ten-percent rules substantially burdened the religious exercise of FDOC inmates who have a sincere belief that their faith requires kosher meals.  See 42 U.S.C. 2000cc-2(b).  The district court found (Doc. 498 at 13, 23-24, 26), and defendants do not dispute on appeal, that the United States satisfied this burden. Br. 31.

Accordingly, at that point the burden of proof shifted to defendants to show that their policies not only further a compelling governmental interest, but do so by the least restrictive means.  See 42 U.S.C. 2000cc-2(b), 2000cc-5(2).

- 27 -

Case law from the Supreme Court and this Court provides guidance on the meaning of the terms "compelling governmental interest" and "least restrictive means."  In the First Amendment context, the Supreme Court has defined a compelling governmental interest as an "interest[] of the highest order," *Wisconsin* v. *Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 1533 (1972), and an "overriding state interest," *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334, 347, 115 S. Ct. 1511, 1519 (1995).  This Court has recognized that "safety and cost *can* be compelling governmental interests" for purposes of Section 3.  *Rich* v. *Secretary, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013) (emphasis added).

The prison, however, must demonstrate, not merely assert, that the challenged practices actually advance a compelling interest and do so by the least restrictive means.  *Rich*, 716 F.3d at 533.  RLUIPA's legislative history establishes that defendants cannot satisfy this burden with "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations."  146 Cong. Rec. 16,699 (2012) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA) (quoting S. Rep. No. 111, 103d Cong., 1st Sess. 10 (1993)); *Rich*, 716 F.3d at 533. The prison fails to carry its burden where the evidence the prison submits in support of its position is insubstantial or speculative, the policy at issue singles out religious exercise for disfavored treatment, or the record as a whole raises doubt as to "whether cost control and security are furthered by" the policy.  *Rich*, 716 F.3d

- 28 -

at 533; see, *e.g.*, *Yellowbear* v. *Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) ("[T]he

deference this court must extend to the experience and expertise of prison

administrators does not extend so far that prison officials may declare a compelling

governmental interest by fiat."); *Lovelace* v. *Lee*, 472 F.3d 174, 190 (4th Cir. 2006)

(prison defendants who asserted a "legitimate interest in removing inmates from

religious dietary programs" for violations of prison rules without presenting any

evidence of security or budget considerations that justify this policy failed to

establish compelling governmental interests) (citation omitted).

In other words, "prison officials cannot simply utter the magic words

'security and costs' and as a result receive unlimited deference from [courts]

charged with resolving these disputes."  *Davila* v. *Gladden*, 777 F.3d 1198, 1206

(11th Cir.) (interpreting RLUIPA's sister statute, the Religious Freedom

Restoration Act (RFRA)), cert. denied, 136 S. Ct. 78 (2015).  Instead, the prison

must present "specific and reliable" evidence supporting its claims.  *Ibid.*

The Supreme Court's recent RLUIPA decision in *Holt* v. *Hobbs*, 135 S. Ct.

853 (2015), provides significant insight into the meaning of the phrase "least

restrictive means."  In that case, the Court described the least restrictive means

standard as "requir[ing] the government to 'sho[w] that it lacks other means of

achieving its desired goal without imposing a substantial burden on the exercise of

religion by the objecting part[y].'"  *Id.* at 864 (quoting *Burwell* v. *Hobby Lobby*

*Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014)) (alterations in original).  The Court

described this standard as "exceptionally demanding."  *Ibid.*  Along similar lines,

the Supreme Court has held, in the First Amendment context, that the least

restrictive means standard requires the state government to "demonstrate that no

alternative forms of regulation would [accomplish the governmental interest]

without infringing First Amendment rights."  *Sherbert* v. *Verner*, 374 U.S. 398,

407, 83 S. Ct. 1790, 1796 (1963); see also *Ashcroft* v. *American Civil Liberties*

*Union*, 542 U.S. 656, 666, 124 S. Ct. 2783, 2791 (2004) (least restrictive means

test in free speech context requires courts to compare challenged regulation to

available, effective alternatives).  "[T]he imposition by the government on

religious worship must be the minimal imposition to accomplish the government's

compelling ends."  *United States* v. *Hardman*, 297 F.3d 1116, 1145 (10th Cir.

2002) (Hartz, J., concurring).

B.    *The FDOC's Blanket Denial Of Kosher Meals Does Not Advance A*
      *Compelling Governmental Interest*

1.  RLUIPA's text expressly requires all States that receive federal funds,

including Florida, to comply with Section 3.  See 42 U.S.C. 2000cc-1(b)(1).  As

the Supreme Court put it, "RLUIPA  *  *  *  applies to the States and their

subdivisions," *Holt*, 135 S. Ct. at 860, and was enacted "to accord religious

exercise heightened protection from *government-imposed* burdens," *Cutter* v.

*Wilkinson*, 544 U.S. 709, 714, 125 S. Ct. 2113, 2117 (2005) (emphasis added).

- 30 -

Defendants' overarching theme is that RLUIPA does not compel a state prison to provide kosher meals to religiously sincere inmates. Defendants argue that RLUIPA merely gives the prison the choice to adopt a religious diet program that the prison is free to disregard any time competing fiscal priorities arise. See Br. 33, 38-41, 51, 55-57. RLUIPA is not so cavalierly discarded, however. The district court correctly concluded that defendants failed to carry their burden under Section 3 of showing that the FDOC's blanket denial of kosher meals is the least restrictive means of advancing a compelling governmental interest.

First, the district court correctly concluded that defendants' decision to offer a kosher diet statewide, and their admission that the FDOC can do so consistent with its interests, demonstrates that the FDOC has no compelling government interest in denying such a diet. Doc. 498 at 16-17. The RDP itself states that it will be implemented statewide. Doc. 29-8 at 3. Relying on testimony of defendants' designated security expert, James Upchurch, that the FDOC had determined that it could "provide a statewide kosher diet plan consistent with its interests" (Doc. 67 at 52), FDOC officials Jon Creamer and Kenneth Anguish testified that the FDOC is "committed" to providing a kosher diet (Doc. 443-5 at 12; Doc. 443-6 at 6). Those two officials, and defendants' designated budget expert Shane Phillips, further admitted that the RDP is "sustainable" for the FDOC. Doc. 443-1 at 24; 443-5 at 12; Doc. 443-6 at 6. In effect, the FDOC states

- 31 -

that it is committed to, *and capable of*, providing kosher meals statewide,

consistent with its penological interests, and simultaneously argues that it has a

compelling interest in not providing such meals.

Numerous courts have upheld the unexceptional proposition that a

government cannot argue that it has a compelling interest in prohibiting something

it already permits without significant hardship.  See, *e.g.*, *Church of Lukumi*

*Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 546-547, 113 S. Ct. 2217, 2233-

2234 (1993) (city failed to establish compelling interest in preventing the slaughter

of animals in one context while allowing it in another).  In the RLUIPA context,

several federal courts of appeals have recognized that a prison lacks a compelling

interest in banning an activity that it expressly allows.

In *Moussazadeh* v. *Texas Department of Criminal Justice*, 703 F.3d 781,

794 (2012), for example, the Fifth Circuit held that a prison's argument that it had

a compelling governmental interest in minimizing costs by denying a kosher meal

to an inmate "is dampened by the fact that it has been offering kosher meals to

prisoners for more than two years."  In *Koger* v. *Bryan*, 523 F.3d 789, 800 (2008),

the Seventh Circuit similarly held that a prison lacked a compelling governmental

interest in denying a non-meat diet to an inmate where "the prison already served

two diets that would have satisfied his request."  See also *Spratt* v. *Rhode Island*

*Dep't of Corr.*, 482 F.3d 33, 40 (1st Cir. 2007) (prison lacked compelling

governmental interest in banning inmate preaching where the prison previously

allowed such preaching); cf. *Davila*, 777 F.3d at 1207 (exceptions to prison's ban

on religious items not sent from a catalog "undercuts the Defendants' argument

that a categorical prohibition  *  *  *  is the least restrictive means of achieving

their objectives"); *Washington* v. *Klem*, 497 F.3d 272, 285 (3d Cir. 2007)

(restriction on the number of religious books a prisoner could possess failed strict

scrutiny where other facilities in state prison system did not impose same

restriction).  Similarly here, defendants' voluntary decision to provide a kosher

diet, along with their concession that they are capable of doing so statewide

consistent with their interests, vitiates any argument that they have a compelling

interest in not providing a kosher diet.

Second, the district court correctly concluded that defendants failed to show

that containing the costs associated with the RDP furthers *any* compelling state

interest.  Doc. 498 at 17-18.  Defendants introduced no evidence showing that

spending money on the RDP affected its operations, including its security

operations.  To the contrary, FDOC officials acknowledged that during the time the

RDP has been offered, the FDOC has not had to discontinue any programs because

of the RDP's costs.  Doc. 442-3 at 108; Doc. 443-7 at 12.

Phillips testified that he is not aware of any lay-offs that have occurred

because of the RDP's cost.  Doc. 442-3 at 108.  FDOC Budget Director Mark

Tallent testified that the additional funds budgeted to the FDOC during the 2014-2015 fiscal year allowed it to give raises to its employees and hire enough additional certified security officers to lower its vacancy rate for that position from nine percent to seven percent.  Doc. 443-7 at 3-4.  Given these admissions, it is not surprising that Upchurch and FDOC Security Bureau Chief Carl Wesley Kirkland, Jr. testified that they were not aware of any significant security incidents related to a kosher diet at any correctional facility in the United States or related to the RDP.  Doc. 443-14 at 6; Doc. 443-24 at 3-4.  Indeed, the evidence showed that the RDP has been safely administered at both the Pilot Program at the SFRC and the UCI.  Doc. 443-22 at 11; Doc 443-23 at 12.

Congress recognized that compliance with RLUIPA would not be cost-free.  As the Supreme Court observed in *Hobby Lobby* with regard to RLUIPA's sister statute RFRA, the view that the government can never be required "to spend even a small amount reflects a judgment about the importance of religious liberty that was not shared by the Congress that enacted that law."  134 S. Ct. at 2781.  Indeed, RLUIPA itself states that a government may need "to incur expenses in its own operations to avoid imposing a substantial burden."  42 U.S.C. 2000cc-3(c).  The Supreme Court tempered this mandate in *Cutter*, holding that "[s]hould inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning

- 34 -

of an institution, the facility would be free to resist the imposition." 544 U.S. at

726, 125 S. Ct. at 2125.

Defendants failed to show that the RDP's costs are "excessive," would

"impose unjustified burdens" on other prisoners, or would "jeopardize the

[FDOC's] effective functioning." *Cutter*, 544 U.S. at 726, 125 S. Ct. at 2125.

Their "worst case scenario" of a $12.3 million annual cost for the RDP rests on a

set of dubious assumptions regarding participation and pickup rates and

questionable allocation of costs to the RDP and savings to the mainline meal. See

pp. 13-14, *supra*. Accordingly, this estimate is insufficiently "specific and

reliable" to support defendants' claimed interest in containing costs. *Davila*, 777

F.3d at 1206. Even assuming, *arguendo*, that this projected cost comes to pass, it

constitutes approximately five one thousandths (0.5%) of the FDOC's overall $2.3

billion budget. The district court correctly concluded that the RDP's costs were

insufficiently large in the context of the FDOC's $2.3 billion total annual budget

for their containment to constitute a compelling governmental interest. Doc. 498 at

15-16. Other federal courts of appeals have suggested that avoiding expenses for

kosher meals that constitute such a small percentage of a prison's costs is not a

compelling governmental interest. Cf. *Moussazadeh*, 703 F.3d at 795 (expressing

skepticism that "saving less than .05% of the food budget constitutes a compelling

interest"); *Beerheide* v. *Suthers*, 286 F.3d 1179, 1191 (10th Cir. 2002) (avoiding

expense of free kosher meals that amount to .158% of the food budget was not

rationally related to penological goal of controlling costs and prisoner abuse of

program).

2.  Defendants' arguments on appeal do not undermine the district court's

determinations.  First, they contend (Br. 32-33) that RLUIPA's legislative history,

which requires courts to apply the Section 3 standard with due deference to the

experience and expertise of prison administrators and consistent with consideration

of costs and limited resources, makes it "clear that Congress intended RLUIPA to

be applied with great sensitivity to a state's limited resources and the need to

control its costs."  Defendants further assert (Br. 42-43) that courts resolve any

"tension" between the statute's text, which requires States to expend resources to

avoid imposing a substantial burden, and its legislative history "by concluding that

an accommodation that imposes substantial or more than *de minimus* [sic] costs

supports a compelling interest."  To buttress these assertions, defendants cite (Br.

33) this Court's precedents, which they claim have "repeatedly concluded" that

controlling costs "is a compelling [governmental] interest that justifies a refusal to

provide a religious diet."

These arguments fail for several reasons.  Under RLUIPA's strict-scrutiny

standard, while the expertise of prison administrators is entitled to "respect" in the

least restrictive means analysis, courts must still "apply RLUIPA's rigorous

standard." *Holt*, 135 S. Ct. at 864. That standard includes requiring prisons, under

certain circumstances, "to incur expenses in [their] own operations to avoid

imposing a substantial burden." 42 U.S.C. 2000cc-3(c). Indeed, numerous courts

have recognized that correctional facilities must expend resources to satisfy

RLUIPA, including providing kosher diets, even when those expenditures are

significant and/or occur in the context of tight state budgets. In *Rich*, this Court

vacated summary judgment for the FDOC despite its claims that providing a

kosher diet would cost from $12-$15 million per year.[5] 716 F.3d at 534; see also

*Garner* v. *Kennedy*, 713 F.3d 237, 245 (5th Cir. 2013) (RLUIPA protected the

right of Muslim prisoners to grow beards despite costs of barbershop construction

and the state's "extremely tight" budget); *Willis* v. *Commissioner, Ind. Dep't of*

*Corr.*, 753 F. Supp. 2d 768, 771, 778 (S.D. Ind. 2010) (rejecting state's claim that

containing spiraling costs and limiting budgetary shortfall qualify as compelling

governmental interests under RLUIPA excusing prison from providing kosher

diet). These cases belie defendants' contention that a state prison need only

expend *de minimis* resources to comply with RLUIPA.[6]

---

[5] The FDOC's cost estimates are set forth in the trial court's opinion. See *Rich* v. *Buss*, No. 1:10-cv-00157, 2012 WL 694839, at *5 (N.D. Fla. Jan. 12, 2012).

[6] The only case defendants cite (see Br. 43) that articulates a *de minimis* cost standard is *Hathcock* v. *Cohen*, 287 F. App'x 793 (11th Cir. 2008). This case

(continued…)

- 37 -

RLUIPA's provision stating that the government may need to incur expenses to avoid imposing a substantial burden on religious exercise is clear, and also fully consistent with its legislative history.  See *Harry* v. *Marchant*, 291 F.3d 767, 773-774 (11th Cir. 2002).  As noted above, *Holt* acknowledges that courts should "respect" the expertise of prison officials, but also commands courts to "apply RLUIPA's rigorous standard."  135 S. Ct. at 864.  Given this mandate, there is certainly no reason for this Court to adopt defendants' proposed gloss that a State *per se* has a compelling interest in controlling costs regardless of evidence proving harm to its operations.  This proposed standard conflicts with the above cases and the Supreme Court's admonition that "[c]ontext matters" in applying RLUIPA's compelling governmental interest standard.  *Cutter*, 544 U.S. at 723, 125 S. Ct. at 2123 (quoting *Grutter* v. *Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325, 2338 (2003)) (alteration in original).  In any event, controlling costs cannot be a compelling governmental interest where, as here, the State has voluntarily committed to spend the funds and admits it can do so without jeopardizing its penological interests.  See pp. 30-32, *supra*.

---

(…continued)
is readily distinguishable, as it concerned a First Amendment claim under the less stringent standard set forth in *Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987), not a RLUIPA claim.  Indeed, this Court concluded that under the *Turner* standard, a jail need not provide an accommodation whose costs are more than *de minimis* because that standard does not impose a least restrictive means test. *Hathcock*, 287 F. App'x at 800.

- 38 -

Defendants' argument that this Court has "repeatedly concluded" that controlling costs "is a compelling governmental interest that justifies a refusal to provide a religious diet" fails to acknowledge this Court's seminal decision in *Rich*, which post-dates the three decisions defendants cite. In *Rich*, this Court reversed summary judgment for the FDOC on the inmate's claim that he was entitled to a kosher diet under RLUIPA because the evidence the FDOC submitted in support of its position was "insubstantial." 716 F.3d at 533. Among other things, this Court found that an affidavit from an FDOC official asserting cost concerns with providing a kosher diet was "based on assumptions that were unsupported by the record." *Ibid.* Because defendants' cost concerns in this case are likewise unsupported, see pp. 32-33, *supra*, this Court's precedents confirm, rather than undermine, the district court's grant of summary judgment to the United States.

No more persuasive is defendants' contention (Br. 34-42) that, as a factual matter, they cannot provide kosher meals statewide because the FDOC is currently experiencing a "budget crisis" and unable to pay for the meals without sacrificing important programs. In particular, defendants assert (Br. 35, 42) that the Florida legislature did not fund the RDP, insist (Br. 35-36, 42) that they are unable to shift money to the food budget without the permission of the Legislative Budget Commission, and raise (Br. 36-37, 39-41, 47) the specter of unfilled staff positions

that would compromise safety and security if they are forced to spend money on a kosher diet.

Defendants' argument is the equivalent of "utter[ing] the magic words 'security and costs'" and expecting to "as a result receive unlimited deference." *Davila*, 777 F.3d at 1206. The record does not support defendants' cost allegations. For the 2014-2015 fiscal year, the Florida legislature increased the FDOC's total budget by $200 million to approximately $2.3 billion; increased the FDOC's food budget by over $1 million, to a total of between $54 and $55 million; and provided $23 million to offset the FDOC's existing budget deficit. Doc. 255-1 at 1-2; Doc. 487 at 1. Tallent contradicted defendants' claim of budget inflexibility, testifying that the FDOC is capable of transferring money to its food budget from other budget categories, and that in the second half of the year, he transfers money between different budget categories, including food service, "several [times] a week." Doc. 443-7 at 8-10. The record evidence also showed that the expenditures on the RDP have had no effect on the security of FDOC facilities. See p. 33, *supra*. In fact, because the FDOC was able to hire additional staff and reduce the vacancy rate for certified security officers from nine percent to seven percent during the 2014-2015 fiscal year, the safety and security of FDOC facilities are in a *better* position now than they were before, when defendants voluntarily began to implement the RDP statewide.

- 40 -

Defendants also argue (Br. 39, 57) that Congress could not have intended to require States to accommodate religious exercise and maintain this accommodation in the face of a possible future fiscal crisis that may, at that time, make its cost no longer bearable. Defendants further reason (Br. 57) that if they can cancel a kosher-diet program in the future due to costs, RLUIPA cannot require them to provide the program in the first instance when they have the same cost concerns. In support of these contentions, defendants cite (Br. 39 n.12, 57) *Holt*'s statement that "an institution might be entitled to withdraw an accommodation if the claimant abuses the exemption in a manner that undermines the prison's compelling interests." 135 S. Ct. at 867.

Defendants' argument fails because the possibility of a future fiscal crisis inhibiting their ability to provide a kosher-diet program is speculative, *Rich*, 716 F.3d at 533, and insufficiently "specific and reliable," *Davila*, 777 F.3d at 1206, and thus cannot establish a current compelling governmental interest. *Holt*'s statement merely acknowledges the common-sense proposition that an institution may be justified in withdrawing an accommodation in the future if significantly changed circumstances render it unable to achieve a compelling interest in prison security by any other means. Indeed, if a fiscal crisis occurs that somehow differentiates defendants from the Federal BOP and the many States that have successfully implemented a kosher diet for years, defendants are free to return to

the district court and request that the court modify its Final Judgment under

Federal Rule of Civil Procedure 60(b).  Such a hypothetical future event presents

no defense to denying a kosher diet *today*, where FDOC officials admit that the

FDOC can offer such a diet consistent with its interests.  See pp. 30-32, *supra*.

Defendants argue (Br. 44-48) that the district court erred in concluding that

the projected costs of the kosher diet were not of a compelling magnitude because

they constituted a small percentage of the FDOC's total annual budget.

Defendants contend (Br. 46-47) that the circuit court cases from which the district

court derived this ratio are inapplicable because they compared the costs of the diet

to the agency's food budget rather than total budget.  Defendants assert (Br. 47-48)

that Congress "undoubtedly" intended for the courts to examine instead the gross

number of dollars to be expended as opposed to a percentage of the budget, to

determine whether costs are sufficiently high to consider containing them a

compelling governmental interest.

Defendants' contentions are without merit.  In fact, the circuit court cases on

which the district court relied – *Moussazadeh* and *Beerheide* – support its decision

because they stand for the proposition that avoiding costs for kosher meals that

constitute only a miniscule percentage of a prison system's expenses do not

constitute a compelling governmental interest for purposes of RLUIPA.

Comparing a prison's expenditures to its total budget is most consistent with the

Supreme Court's request that courts consider context in determining whether a State has established a compelling governmental interest under RLUIPA. See *Cutter*, 544 U.S. at 723, 125 S. Ct. at 2123. Indeed, using a gross dollar amount instead of a percentage of the total agency budget ignores the reality that some state correctional institutions are more capable of absorbing costs than others due to the size of their budget, and thus what may constitute a significant figure for one institution will be a minor figure for another. See Doc. 453-1 (stating that the annual budget for the Delaware Department of Corrections is less than $200 million).

Finally, defendants' contention (Br. 49-51) that the Federal BOP has resisted attempts to require it to provide religious meals to its inmates using the same cost arguments that defendants make in this case misses the mark. For two decades, the Federal BOP has provided kosher meals to its inmates in all facilities, including maximum-security facilities and all federal facilities in Florida. Doc. 49-14; Doc. 56-1 at 9; Doc. 67 at 83; Doc. 68 at 121, 134-135; Doc. 443-8 at 8; Doc. 443-17 at 7-8; Doc. 443-28 at 3-4. The Federal BOP has determined that its kosher meal "[i]s the strictest diet and subsume[s] all other religious dietary needs," and thus has resisted inmates' requests for specialized religious meals that would impose additional costs without relieving a substantial burden on religious exercise. *Patel* v. *United States Bureau of Prisons*, 515 F.3d 807, 810-811 (8th Cir. 2008); *Ford* v.

*Federal Bureau of Prisons*, No. 08-cv-00882, 2011 WL 2415790, at *3-4 (D. Colo.
May 24, 2011).

Indeed, several cases defendants cite (Br. 34) to support their argument that
a State has a compelling interest in containing costs by resisting a kosher diet
support the Federal BOP's position.  These cases held that state correctional
institutions need not provide additional dietary accommodations to individual
prisoners, such as requests for specific foods, where they have already expended
significant resources to provide religious diets that met nearly all prisoners'
religious needs.  See, *e.g.*, *Coleman* v. *Jabe*, No. 7:11-cv-00578, 2013 WL
4084762, at *2 (W.D. Va. Aug. 13, 2013) (rejecting request for halal meat where
Virginia already serves a "Common Fare diet  *  *  *  designed to meet the
nutritional and religious needs of all known religious groups, including Muslims
and Jews"); *Wesley* v. *City of New York*, No. 05-cv-5833, 2012 WL 3262749, at *1
(S.D.N.Y. Aug. 10, 2012) (rejecting request for foods that met inmate's specific
interpretation of halal where the department of corrections "implement[ed] a
religious meals program to accommodate the religious dietary requirements of
Muslim and other prisoners, ultimately spending about $200 million to do so");
*Yisrael* v. *Beasley*, No. 5:08-ct-3079, 2012 WL 2919984, at *6 (E.D.N.C. July 17,
2012) (concluding that isolated contamination issues did not substantially burden

religious exercise "in light of defendants' significant efforts to provide plaintiff

with a completely kosher diet"), aff'd 516 F. App'x 360 (4th Cir. 2013).

The order below similarly allows the FDOC to accommodate a large number

of religious practices through a standard kosher religious diet option, as many other

prison systems (including the Federal BOP) have done.  While there may be some

FDOC prisoners who request specialized religious diets apart from the kosher diet,

the United States does not seek that relief.  In the court below, the United States

sought an order that would require the "FDOC to offer a kosher diet to all prisoners

with a sincere basis for seeking that religious accommodation."  Doc. 443 at 36.

C.    *The FDOC's Blanket Ban On Kosher Meals Is Not The Least Restrictive*
      *Means Of Advancing A Compelling Governmental Interest*

Defendants also failed to carry their burden of proof on the "exceptionally

demanding," *Holt*, 135 S. Ct. at 864 (quoting *Hobby Lobby*, 134 S. Ct. at 2780),

"least restrictive means" factor.  The Supreme Court has observed that "the

policies followed at other well-run [correctional] institutions [are] relevant to a

determination of the need for a particular type of restriction."  *Id.* at 866 (quoting

*Procunier* v. *Martinez*, 416 U.S. 396, 414 n.14, 94 S. Ct. 1800, 1812 n.14 (1974),

overruled on other grounds by *Thornburgh* v. *Abbott*, 490 U.S. 401, 109 S. Ct.

1874 (1989)).

It therefore follows, as occurred here, that a prison's claim that a specific

restriction on religious exercise is the least restrictive means of advancing

compelling governmental interests is significantly undermined by evidence that many other prisons, with the same compelling interests, allow the practice at issue. In *Holt*, the Supreme Court stated that "when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." 135 S. Ct. at 866. This Court stated in *Rich* that "[w]hile the practices at other institutions are not controlling, they are relevant to an inquiry about whether a particular restriction is the least restrictive means by which to further a shared interest." 716 F.3d at 534; see also *Warsoldier* v. *Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005) ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means.").

The Federal BOP's treatment of kosher meals is particularly relevant in this analysis, as the Federal BOP for many years "has managed the largest correctional system in the Nation under the same heightened scrutiny standard as RLUIPA without compromising prison security, public safety, or the constitutional rights of other prisoners." *Cutter*, 544 U.S. at 725, 125 S. Ct. at 2124 (quoting U.S. Br. at 24 (No. 03-9877)). Where the Federal BOP accommodates a particular religious exercise, a state prison defendant that substantially burdens that same exercise is unlikely to satisfy RLUIPA's strict-scrutiny inquiry "in the absence of any

explanation by [the defendant] of significant differences between the [state prison] and a federal prison that would render the federal policy unworkable." *Spratt*, 482 F.3d at 42; see also *Native Am. Council of Tribes* v. *Weber*, 750 F.3d 742, 752 (8th Cir. 2014) (affirming injunction of defendant state prison's complete ban on inmates' use of tobacco for religious purposes where "extensive evidence demonstrate[ed] that numerous correctional facilities throughout the United States permit inmates to use tobacco for religious purposes subject to various limitations").

The district court correctly recognized the Federal BOP, and most major state prisons, in the United States offer a kosher meal option to prisoners with a sincere religious basis for requesting one, undermining defendants' contention that they are unable to do so.  Doc. 498 at 19-20.  Central to the district court's conclusion was its determination that defendants failed to show how their budget issues differed from those faced by other prison systems.  Defendants do not attempt in their opening brief to correct this oversight and identify any meaningful distinction between the FDOC's operation and the operation of these institutions that justifies the FDOC's denial of a kosher diet.  This omission strongly suggests that the FDOC's blanket denial of a kosher diet is not the least restrictive means to further the cost interest it asserts.  See, *e.g.*, *Holt*, 135 S. Ct. at 866; *Rich*, 716 F.3d at 534; *Weber*, 750 F.3d at 752; *Spratt*, 482 F.3d at 42; *Warsoldier*, 418 F.3d at

- 47 -

999-1000.  Indeed, in *Rich*, this Court reversed a grant of summary judgment to the

Secretary and other FDOC officials in another Section 3 case brought by a prisoner

seeking a kosher diet "in light of the Defendants' meager efforts to explain why

Florida's prisons are so different from the penal institutions that now provide

kosher meals such that the plans adopted by those other institutions would not

work in Florida."  716 F.3d at 534.

Florida's own history of providing special diets to its inmates buttresses this

conclusion.  The FDOC has long offered vegan, therapeutic, and medical meal

plans, which cost more than the mainline meal plan, despite budget shortfalls.  The

marginal cost of these alternative meals is similar to the marginal cost of the

kosher meal.  Doc. 443-1 at 11, 15; Doc. 487 at 2, 4.  Upchurch admitted that the

FDOC "has been able to successfully manage any issues relat[ing] to providing

these special diets to certain prisoners for at least a number of years."  Doc. 67 at

60.  This ability to offer alternative meals further suggests that there are less

restrictive alternatives to further the FDOC's interest in cost savings than a blanket

denial of kosher meals.  See *Rich*, 716 F.3d at 534.

None of defendants' substantive challenges to the district court's

determination on this issue have merit.  First, defendants contend (Br. 52-55) that

providing an alternative no-meat option and vegan meal in place of the kosher

meal constitutes the least restrictive means of furthering their compelling interest

in cost containment.  Defendants, however, have admitted that the no-meat options and vegan meals are not kosher, and that a blanket denial of kosher meals is a substantial burden on religious exercise.  Doc. 487 at 2; Doc. 498 at 3-4, 13; Br. 31.  Therefore, this Court should not entertain their assertion that these alternative meals are the least restrictive means of resolving that burden.  Indeed, Upchurch's testimony and this Court's decision in *Rich* indicate that the alternative diets defendants currently provide to inmates are evidence that they can provide a kosher diet, not *substitutes* for a kosher diet.

Next, defendants assert (Br. 55-57) that "[t]his court has rejected reliance on what other institutions choose to do," accompanied by a citation to this Court's decision in *Knight* v. *Thompson*, 723 F.3d 1275, 1286-1287 (2013) (*Knight I*), reinstated in part and superseded in part by 797 F.3d 934 (11th Cir. 2015) (*Knight II*), petition for cert. pending, No. 15-999 (filed Feb. 4, 2016).  This argument fails to come to terms with the extensive case law from the Supreme Court, this Court, and other federal courts of appeals recognizing that evidence of what other prison systems do is clearly relevant to determining whether a state prison has satisfied RLUIPA's least-restrictive-means factor.  *Knight II*, moreover, is readily distinguishable from this case.  On remand for consideration in light of *Holt*, *Knight II* reiterated *Knight I*'s holding that "[w]hile the practices of other institutions are relevant to the RLUIPA analysis, they are not controlling."  *Knight*

*II*, 797 F.3d at 947. This Court reasoned that the state prison in *Knight II* justified its ban on long hair for male inmates by "show[ing] that no efficacious less restrictive measures exist," based in large measure on a "detailed" record of actual security incidents caused by male prisoners wearing long hair. *Id.* at 944-945, 947. In this case, by contrast, ample testimony demonstrated that providing kosher meals does not create cost or security concerns. See pp. 32-33, *supra*. To the extent that *Knight II* has any relevance to this case, it is to underscore that defendants failed to demonstrate that its blanket denial of kosher meals is the least restrictive means of advancing a compelling government interest.

D.    *The RDP's Zero-Tolerance And Ten-Percent Rules Are Not The Least Restrictive Means Of Advancing A Compelling Governmental Interest*

The district court also correctly concluded that defendants failed to show that the RDP's zero-tolerance and ten-percent rules are the least restrictive means of advancing a compelling governmental interest. Defendants do not challenge these holdings on appeal.

With regard to the RDP's zero-tolerance rule, budget expert Phillips acknowledged that the FDOC had not conducted a full analysis as to whether the removal of a prisoner from the RDP without a prior opportunity to explain would save the FDOC money. Doc. 67 at 144. Accordingly, defendants' claim of a compelling governmental interest in controlling costs is speculative, *Rich*, 716 F.3d at 533, and insufficiently "specific and reliable," *Davila*, 777 F.3d at 1206.

Defendants also acknowledged that they can give a prisoner the opportunity to explain the circumstances behind his consumption of a non-kosher food item prior to the prisoner's removal from the RDP, similar to what the Federal BOP does for its kosher diet and what the FDOC provides to prisoners on its vegan and medical diets.  Doc. 246 at 5-6; Doc. 443-1 at 33-34; Doc. 443-32 at 3-6.  The concession indicates that the zero-tolerance rule is not the least restrictive means of advancing defendants' claimed interest in controlling costs.  See *Holt*, 135 S. Ct. at 864, 866; *Rich*, 716 F.3d at 534; see also *Weber*, 750 F.3d at 752; *Washington*, 497 F.3d at 284; *Warsoldier*, 418 F.3d at 999; *Murphy* v. *Missouri Dep't of Corr.*, 372 F.3d 979, 988-989 (8th Cir.), cert. denied, 543 U.S. 991, 125 S. Ct. 501 (2004).

Regarding the RDP's ten-percent rule, neither Phillips nor security expert Upchurch analyzed the cost savings of the rule.  Doc. 67 at 49, 156-157; Doc 443-1 at 28-30.  Therefore, defendants' claim of a compelling governmental interest in controlling costs is speculative, *Rich*, 716 F.3d at 533, and insufficiently "specific and reliable," *Davila*, 777 F.3d at 1206.  The evidence also showed that the FDOC tracks inmate participation in meals and prepares food based on the number of prisoners it expects will eat at a given meal (Doc. 443-1 at 7-8, 26-27; Doc. 443-5 at 3; Doc. 443-27 at 5-8), and assembles meals only as they are needed, saving unused cold food materials for later use (Doc. 443-9 at 3-4; Doc. 443-27 at 9-11).  Because the RDP meal pickup rate is 75% (Doc. 442-3 at 23; Doc. 443-9 at 9),

these less-restrictive methods actually save significant amounts of money

compared to enforcement of the ten-percent rule, which compels an inmate to pick

up RDP meals at a 90% rate to stay in the program regardless of whether he wants

to eat.  Accordingly, defendants failed to demonstrate that the ten-percent rule is

the least restrictive alternative for their claimed interest in controlling costs.  See

*Holt*, 135 S. Ct. at 864; *Rich*, 716 F.3d at 534; see also *Washington*, 497 F.3d at

284; *Warsoldier*, 418 F.3d at 999; *Murphy*, 372 F.3d at 988-989.


## II

### THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN PERMANENTLY ENJOINING DEFENDANTS FROM DENYING KOSHER MEALS TO ALL PRISONERS WITH A SINCERE RELIGIOUS BELIEF FOR KEEPING KOSHER AND FROM ENFORCING THE ZERO-TOLERANCE AND TEN-PERCENT RULES

This Court should uphold the district court's entrance of a permanent

injunction.  "To obtain a permanent injunction, a party must show:  (1) that he has

prevailed in establishing the violation of the right asserted in his complaint; (2)

there is no adequate remedy at law for the violation of this right; (3) irreparable

harm will result if the court does not order injunctive relief; and (4) if issued, the

injunction would not be adverse to the public interest."  *Thomas* v. *Bryant*, 614

F.3d 1288, 1317 (11th Cir. 2010).  A district court possesses wide discretion to

craft injunctive relief to address ongoing or potential harm.  See, *e.g.*, *id.* at 1317-

- 52 -

1318; *LaMarca* v. *Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993), cert. denied, 510

U.S. 1164, 114 S. Ct. 1189 (1994).

Where the district court enters a permanent injunction in the prison-litigation

context, it also must satisfy the requirements of the PLRA.  The PLRA provides

that "[p]rospective relief in any civil action with respect to prison conditions shall

extend no further than necessary to correct the violation of the Federal right of a

particular plaintiff or plaintiffs" and shall not be granted "unless the court finds

that such relief is narrowly drawn, extends no further than necessary to correct the

violation of the Federal right, and is the least intrusive means necessary to correct

the violation of the Federal right."[7]  18 U.S.C. 3626(a)(1)(A); see also *Thomas*,

614 F.3d at 1317 ("[W]e must also ensure that the scope of the awarded

[injunctive] relief does not exceed the identified harm.").  Moreover, "[t]he court

shall give substantial weight to any adverse impact on public safety or the

operation of a criminal justice system caused by the relief."  18 U.S.C.

3626(a)(1)(A).  This Court has instructed district courts to "discuss [the PLRA's

need-narrowness-intrusiveness] factors and enter findings that are as specific to the

---

[7]  RLUIPA itself anticipates that the PLRA applies to RLUIPA claims.  See
42 U.S.C. 2000cc-2(e) ("Nothing in this chapter shall be construed to amend or
repeal the Prison Litigation Reform Act of 1995 (including provisions of law
amended by that Act).").

case as the circumstances permit." *Johnson* v. *Breeden*, 280 F.3d 1308, 1326

(2002).

A.    *The United States Satisfied The Factors For Permanent Injunctive Relief In This Case*

The district court's grant of summary judgment to the United States on three

of its RLUIPA claims satisfied the first factor for entering permanent injunctive

relief – that the United States prevailed in establishing a violation of the right

asserted in its complaint.  The remaining factors a court must consider in deciding

whether to grant a permanent injunction essentially involve an assessment of the

necessity of that relief.  The record here easily satisfied the factors, and indeed,

defendants do not challenge in their opening brief the proprietary of a permanent

injunction under this standard.

FDOC prisoners who have a sincere religious belief in keeping kosher do

not have an adequate remedy at law to address the denial of kosher meals, and thus

will sustain irreparable harm if an injunction does not issue.  See *Lewis* v. *S.S.*

*Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976) ("Often times the concepts of

'irreparable injury' and 'no adequate remedy at law' are indistinguishable.").

Because no legal remedy or amount of money damages will protect a religiously

sincere inmate from the injury associated with a future deprivation of kosher

meals, which will force him to choose between going without food and violating

- 54 -

his faith, such an inmate does not have an adequate remedy at law to address the immediate RLUIPA violation.  See *Thomas*, 614 F.3d at 1322.

Along similar lines, "RLUIPA enforces First Amendment freedoms," and the FDOC's blanket denial of kosher meals and its implementation of the zero-tolerance and ten-percent rules will inflict irreparable harm on many FDOC inmates who wish to exercise their faith freely by keeping kosher.  *Opulent Life Church* v. *City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (finding irreparable harm when RLUIPA is violated).  Moreover, because irreparable injury occurs where First Amendment freedoms are deprived "for even minimal periods of time," *Elrod* v. *Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976), the availability of a post-suspension grievance procedure in the RDP does not mitigate the harm imposed by the zero-tolerance rule's removal of inmates for a single violation and the ten-percent rule's removal of inmates for failing to consume a certain percentage of meals.  See Doc. 498 at 23-24, 26.

The public interest also weighs heavily in favor of a permanent injunction. Enforcement of federal statutes is in the public interest.  See *United States* v. *Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest."), cert. denied, 133 S. Ct. 2022 (2013).  This principle is particularly applicable in the case of RLUIPA, which passed both houses of Congress unanimously as "the latest of long-running

- 55 -

congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter* v. *Wilkinson*, 544 U.S. 709, 714, 125 S. Ct. 2113, 2117 (2005).  To that end, RLUIPA provides that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [the statute] and the Constitution."  42 U.S.C. 2000cc-3(g).  Because the Summary Judgment Order interpreted RLUIPA to protect broadly the religious exercise of FDOC inmates with a sincere religious belief in keeping kosher, permanent injunctive relief prohibiting implementation of the blanket ban on kosher meals and the RDP's ten-percent and zero-tolerance rules best serves the public interest.

B.    *The District Court Satisfied The PLRA's Need-Narrowness-Intrusiveness Requirements In Entering A Permanent Injunction*

The district court satisfied the PLRA's need-narrowness-intrusiveness requirements in entering its permanent injunction.  The district court considered extensive evidence on defendants' blanket denial of a kosher diet and each of the provisions of the RDP that it determined violated RLUIPA, and made the express findings supporting its injunction this Court and the PLRA require in its Summary Judgment Order.  Indeed, defendants do not challenge the district court's PLRA findings in their opening brief.

First, the district court properly ordered defendants to provide kosher meals to all prisoners with a sincere religious belief in keeping kosher.  The court

determined that there was a need for the injunction because defendants have long

maintained that RLUIPA gives them the freedom to stop providing these meals at

any time.  Doc. 498 at 22.  The court also found that the injunction was sufficiently

narrow because it was limited to remedying the RLUIPA violation the court found,

and was the least intrusive means of accomplishing that goal because it left

defendants free to craft their own solution related to providing kosher meals.  Doc.

498 at 22-23.  Finally, the court concluded that there was no evidence in the record

that an injunction "would have any effect on public safety or the operation of

FDOC."  Doc. 498 at 23.  These findings were "as specific to the case as the

circumstances permit[ted]," *Johnson*, 280 F.3d at 1326, and thus pass muster under

the PLRA.

The district court also properly enjoined defendants' enforcement of the

RDP's ten-percent and zero-tolerance rules.  The court determined that there was a

need for the injunction because the rules violated RLUIPA; that the injunction was

narrowly drawn because it only prevented defendants from enforcing those rules;

and that the injunction was the least intrusive means of remedying the RLUIPA

violation because it left defendants "wide latitude to fashion other methods of

ensuring that only sincere prisoners partake in the RDP" for the zero-tolerance

rule, and "other methods for ensuring that waste is limited" for the ten-percent rule.

Doc. 498 at 25, 28.  These findings also were "as specific to the case as the

circumstances permit[ted]," *Johnson*, 280 F.3d at 1326, and thus satisfy the PLRA.

## CONCLUSION

This Court should affirm the district court's Final Judgment.

Respectfully submitted,

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

s/ Christopher C. Wang
MARK L. GROSS
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 514-9115
  Chris.Wang@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the attached BRIEF FOR THE UNITED STATES AS APPELLEE:

1. complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 13,462 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(a)(7)(B)(iii) and Eleventh Circuit Rule 32-4 and

2. complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rules of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman font.

s/ Christopher C. Wang
CHRISTOPHER C. WANG
 Attorney

Date:  February 24, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2016, I electronically filed the

foregoing BRIEF FOR THE UNITED STATES AS APPELLEE with the United

States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, and

that seven paper copies identical to the electronically filed brief were sent to the

Clerk of the Court by certified First Class mail, postage prepaid.  I further certify

that defendants' counsel of record will be served by the appellate CM/ECF system

except for the following individual who will be served by certified U.S. mail:

Pam Bondi
Attorney General's Office
444 Brickell Avenue, Ste. 650
Miami, FL 33131

s/ Christopher C. Wang
CHRISTOPHER C. WANG
 Attorney