No. 15-14117

_____

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, et al.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Southern District of Florida, Case No. 1:12-cv-22958-PAS

_____

**BRIEF FOR *AMICUS CURIAE*
THE BECKET FUND FOR RELIGIOUS LIBERTY**

_____

Shay Dvoretzky (sdvoretzky@jonesday.com)
Yaakov Roth (yroth@jonesday.com)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

Eli Savit (esavit@jonesday.com)
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI, 48226
(313) 733-3939

Attorneys for *Amicus Curiae*

No. 15-14117
*United States v. Secretary, Florida Dep't of Corrections*

## CERTIFICATE OF INTERESTED PARTIES
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for *amicus curiae* certifies that the Becket Fund for Religious Liberty has no parent corporations, and that no publicly held corporation holds 10% or more of its stock.  Counsel further certifies that, in addition to the persons listed in the briefs of Defendants-Appellants and Plaintiff-Appellee, the following persons may have an interest in the outcome of this case:

Becket Fund for Religious Liberty, amicus curiae

Dvoretzky, Shay, Attorney, Jones Day, counsel for amicus curiae

Jones Day, counsel for amicus curiae

Roth, Yaakov, Attorney, Jones Day, counsel for amicus curiae

Savit, Eli, Attorney, Jones Day, counsel for amicus curiae

s/ Shay Dvoretzky
Shay Dvoretzky (sdvoretzky@jonesday.com)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939
*Attorney for Amicus Curiae*

C-1

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES ....................................................C-1

TABLE OF AUTHORITIES ................................................................... iii

INTERESTS OF THE *AMICUS CURIAE*..............................................................1

STATEMENT OF THE ISSUE...............................................................2

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ...................................................................................7

I.    THE STATE'S COST PROJECTIONS ARE VASTLY INFLATED

AND GROSSLY OUT OF STEP WITH THE EXPERIENCE IN

OTHER PRISON SYSTEMS.........................................................7

    A.    The Vast Majority of States and the Federal Government

        Provide Kosher Diets to Inmates at Reasonable Cost.........................7

    B.    The State's Sky-High Participation Rate Is Attributable to Its

        Own Failure To Properly Screen for Sincerity ..................................12

    C.    The State Has Also Dramatically Reduced the Per-Inmate Cost

        of Kosher Food Through Menu Adjustments ....................................21

# TABLE OF CONTENTS
## (continued)

Page

II.    THE STATE'S LITIGATION CONDUCT CASTS DOUBT ON ITS

CREDIBILITY .................................................................................24

CONCLUSION ..........................................................................................29

CERTIFICATE OF COMPLIANCE.........................................................30

CERTIFICATE OF SERVICE ..................................................................31

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agrawal v. Briley*,
    No. 02-C-6807, 2004 U.S. Dist. LEXIS 16997
    (N.D. Ill. Aug. 25, 2004) ........................................................................ 8

*Ashelman v. Wawrzaszek*,
    111 F.3d 674 (9th Cir. 1997) ................................................................. 8

*Beerheide v. Suthers*,
    286 F.3d 1179 (10th Cir. 2002) ...................................................... 8, 20

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) ............................................................. 1

*Buchanan v. Burbury*,
    No. 3:05-CV-7120, 2006 U.S. Dist. LEXIS 48244
    (N.D. Ohio July 17, 2006) ...................................................................... 8

*Caruso v. Zenon*,
    No. 95-MK-1578, 2005 U.S. Dist. LEXIS 45904
    (D. Colo. July 25, 2005) .................................................................... 8, 9

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ............................................................... 15, 20, 23

*Haight v. Thompson*,
    763 F.3d 554 (6th Cir. 2014) .............................................................. 14

*Harrell v. Florida Bar*,
    608 F.3d 1241 (11th Cir. 2010) .......................................................... 26

*Holt v. Hobbs*,
    135 S. Ct. 853 (2015) ..................................................................... 8, 13

*Hudson v. Dennehy*,
    538 F. Supp. 2d 400 (D. Mass. 2008) ................................................. 8

*Kahane v. Carlson*,
    527 F.2d 492 (2d Cir. 1975) ................................................................. 7

*Koger v. Bryan*,
    523 F.3d 789 (7th Cir. 2008) ................................................................ 8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Love v. McCown*,
38 F. App'x. 355 (8th Cir. 2002) .................................................................8

*Love v. Reed*,
216 F.3d 682 (8th Cir. 2000) ......................................................................8

*Madison v. Riter*,
240 F. Supp. 2d 566 (W.D. Va. 2003), *overruled on other grounds*,
355 F.3d 310 (4th Cir. 2003) ......................................................................8

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
703 F.3d 781 (5th Cir. 2012) ......................................................................1

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
No. 3:07-CV-00574, 2011 U.S. Dist. LEXIS 106451
(S.D. Tex. Sept. 20, 2011) ...............................................................10, 13

*Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*,
633 F.3d 1297 (11th Cir. 2011) ................................................................26

*Native Am. Council of Tribes v. Weber*,
750 F.3d 742 (8th Cir. 2014) ....................................................................14

*Prushinowski v. Hambrick*,
570 F. Supp. 863 (E.D.N.C. 1983) .............................................................8

*Rich v. Sec'y, Fla. Dep't of Corrs.*,
716 F.3d 525 (11th Cir. 2013) .........................................................*passim*

*Spratt v. R.I. Dep't of Corrs.*,
482 F.3d 33 (1st Cir. 2007) .......................................................................14

*Thompson v. Vilsack*,
328 F. Supp. 2d 974 (S.D. Iowa 2004) .......................................................8

*Toler v. Leopold*,
No. 2:05-CV-82, 2008 U.S. Dist. LEXIS 27121
(E.D. Mo. Apr. 3, 2008) .............................................................................8

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) ..............................................................13, 23

iv

*Willis v. Comm'r, Ind. Dep't of Corrs.*,
  753 F. Supp. 2d 768 (S.D. Ind. 2010)...........................................................8, 12

STATUTES

42 U.S.C. § 2000cc-1(a)...........................................................................................2

42 U.S.C. § 2000cc-3(c)........................................................................................2, 3

OTHER AUTHORITIES

Joe Gould, *Kosher and Halal MREs Feed Religious Diversity*, ARMY
  TIMES, Mar. 22, 2010, 2010 WLNR 7044045 ......................................................9

Michigan Office of the Auditor General, *Performance Audit of
  Prisoner Food Services* (2008)............................................................................12

Nebraska Correctional Servs., Admin. Reg. 108.01, *Food Service*
  (2011) ....................................................................................................................11

New Mexico Corrs. Dep't, CD-150900, *Food Service Procedures*
  (rev. 2015) ............................................................................................................10

*New Study: Nearly Half of Supermarket Producets are Kosher*,
  MATZAV NETWORK, May 27, 2010 ........................................................................9

Joshua Runyan, *Florida Partners With Aleph to Bring Kosher Food to
  Prisoners*, CHABAD.ORG, July 7, 2010..................................................................9

U.S. Dep't of Justice, Federal Bureau of Prisons, No. P5360.09,
  *Religious Beliefs and Practices* (2004)..............................................................10

Vermont Dep't of Corr., Interim Procedure 354.05, *Inmate Alternative
  Diets* (2010) .........................................................................................................11

Wyoming Dep't of Corrs., Policy & Procedure No. 5.601, *Religious
  Diet Program for Inmates* (2009)...............................................................10, 18

## INTERESTS OF *AMICUS CURIAE*[1]

The Becket Fund for Religious Liberty is a nonprofit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. The Becket Fund has represented Buddhists, Christians, Hindus, Jains, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in litigation in the United States and around the world. The Becket Fund has extensive experience defending the free exercise rights of prisoners under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and has represented multiple prisoners seeking religious dietary accommodations. *See, e.g.*, *Rich v. Sec'y, Fla. Dep't of Corrs.*, 716 F.3d 525 (11th Cir. 2013) (Jewish inmate seeking kosher diet); *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) (Jewish inmate seeking kosher diet and permission to wear yarmulke); *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781 (5th Cir. 2012) (Jewish inmate seeking kosher diet). Based on this experience, the Becket Fund has unique insight into the nuts and bolts of prison dietary accommodations and kosher diets in particular.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part; no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of the brief.

## STATEMENT OF THE ISSUE

RLUIPA prohibits the recipients of federal funds, including Defendants-Appellants, from imposing "substantial burden[s]" on the religious exercise of prison inmates unless there is no less restrictive means of furthering a compelling state interest.  *See* 42 U.S.C. § 2000cc-1(a).  The statute expressly recognizes that a government may be required "to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."  *Id*. § 2000cc-3(c).

The issue on appeal is whether the District Court correctly concluded, after careful review of the factual record, including expert testimony and the experience of other state prisons, that Defendants-Appellants could not prove that withholding a kosher diet from inmates whose sincere religious beliefs require such a diet is the least restrictive means of furthering a compelling state interest in cost containment.

## SUMMARY OF ARGUMENT

The State concedes that the denial of a kosher diet imposes a "substantial burden" on the religious exercise of prisoners, such as observant Jews, whose religious beliefs prohibit them from consuming non-kosher food. Thus, the central question on appeal is whether the State has satisfied its heavy burden of proving that the denial of such a diet is the "least restrictive means" of furthering a "compelling" governmental interest. In particular, would the cost of providing kosher food be so exorbitant as to excuse the State from providing it?

As the United States argues, the State has fatally undermined its "cost" defense by simultaneously asserting that it *can* and *will* provide kosher food to inmates. (U.S. Br. 30-32.) *Amicus* fully agree. But even setting that aside, the State's "cost" defense fails. RLUIPA itself expressly provides that it "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c). The viability of the State's defense thus necessarily rests on how substantial the cost truly is, and whether any less restrictive alternatives exist for reducing it. And for at least three reasons, the State's assertion that providing a kosher diet is cost-prohibitive must be viewed with profound skepticism.

I.     The key figure offered by the State in trying to prove the cost of a kosher diet—the expected participation rate in its kosher-diet program—is

3

implausible. The State claims that approximately eight percent of all inmates will need a kosher diet. (State Br. 20-21.) This claim, based on current enrollment in Florida's kosher-diet program, is far above the participation rate reported by the Federal Bureau of Prisons and other state prison systems that provide kosher diets. In practice, when prisons employ ordinary tools of managing kosher diets, participation rates generally stabilize at roughly 1% or less of population. Indeed, Florida's own Jewish Dietary Accommodation ("JDA") Program, which it operated from 2004-2007, had an average participation rate of only 0.25%. The huge disparity between what Florida claims and what other states have observed strongly suggests that Florida is doing something wrong.

And, in fact, it is. When inmates apply for Florida's kosher-diet program, prison officials fail entirely to probe their religious sincerity. Accordingly, non-religious inmates are able to enroll in Florida's kosher-diet program as a matter of course. And when (inevitably) those non-religious inmates *demonstrate* their lack of religious sincerity by eating non-kosher food, Florida refuses to remove them from the kosher-diet program—claiming the removal process would impose too great an administrative burden. But any costs or burdens associated with removing non-sincere inmates from the kosher-diet program could be avoided if Florida meaningfully screened for religious sincerity in the first place.

**II.**  The State further asserts that a kosher diet will cost about $3.55 per-inmate per-day.  (State Br. 13).  Yet over the course of this litigation, the State has repeatedly, and dramatically, reduced the per-inmate costs of kosher meals. During the preliminary-injunction phase of this case, the State told the District Court (and later this Court) that a kosher diet would cost $7.35 per-inmate per-day. (Appellants' Initial Br., No. 14-10086, at 8.)  That figure was based on what the State later conceded was "the Cadillac version" of a kosher diet (DE 105 at 41-45), which included hot, "pre-packaged shelf-stable kosher meals" twice a day, "supplemented by bread, fruit, beverages, and breakfast items."  DE 35-1.

But as soon as the State was faced with an injunction ordering it to provide kosher meals statewide, it quickly found ways to revise kosher menus, and thereby reduce the meals' cost: first to $5.76 per-inmate per-day (DE 132-3), and now to $3.55 (DE 487 at 4)—*less than half* of what it first claimed.  The State's demonstrated ability to reduce the costs of kosher meals when faced with a court order suggests that it may yet discover further cost-savings if the District Court's injunction is affirmed.  And even if no additional cost-cutting is on the horizon, the State's prior menu revisions—which resulted in less-appetizing kosher food being offered to inmates—will continue to cause non-sincere inmates to withdraw from the kosher-diet program, further reducing costs.

**III.**    Most fundamentally, the State lacks credibility on these issues. Throughout this litigation, the State has repeatedly reported inflated kosher-meal costs—at one point claiming, absurdly, that *44%* of its prison population might require kosher meals—apparently in an effort to bolster its litigation position that providing such meals is cost-prohibitive.

At the same time, the State has engaged in extensive litigation gamesmanship  to avoid judicial oversight of its kosher-food program.  In another recent case challenging Florida's lack of kosher diet, the State tried (unsuccessfully) to moot the prisoner's appeal by proposing—on the eve of oral argument at this Court—to roll out a kosher diet at *only* that prisoner's facility. Likewise, the State argued below that *this* case was moot because it planned to offer kosher meals statewide by mid-2013, even though it hid its new policies from the federal government during court-ordered mediation.  Then, as soon as its mootness gambits failed, the State backtracked from its plan to offer kosher meals statewide by mid-2013.  And despite claiming that it would offer a kosher diet for the foreseeable future, the State refused to agree to any settlement or consent decree that would hold it to its word.

In short, everything the State has done has been focused on avoiding a binding court order to provide a kosher diet.  This conduct only highlights the need for judicial intervention.

## ARGUMENT

### I.  THE STATE'S COST PROJECTIONS ARE VASTLY INFLATED AND GROSSLY OUT OF STEP WITH THE EXPERIENCE IN OTHER PRISON SYSTEMS.

The State does not dispute that failure to provide a kosher diet imposes a substantial burden under RLUIPA. Instead, it argues that denying a kosher diet is the only way to avoid crippling costs. But its cost estimates are grossly out of step with the experience in other states, because—as the District Court noted—the State has "actively chosen not to use . . . cost reduction methods." DE 498 at 21. Because the State has "at [its] disposal an alternative means to contain costs without burdening the religious exercise" of prisoners, the District Court correctly concluded that the State has "not shown that a blanket denial of kosher meals is the least restrictive means of achieving [its] compelling interest." *Id*. at 21-22.

#### A.  The Vast Majority of States and the Federal Government Provide Kosher Diets to Inmates at Reasonable Cost.

Prisons have been providing kosher diets for decades. In 1975, the Second Circuit held that denying a kosher diet violated the First Amendment. *Kahane* v. *Carlson*, 527 F.2d 492, 495-96 (2d Cir. 1975). Since *Kahane*, over a dozen courts—including the Seventh, Eighth, Ninth, and Tenth Circuits—have held that denying a religious diet violates the First Amendment or RLUIPA.[2] Today, at

---

[2] Each of these cases involved a ruling on the merits that the prison had to provide a religious diet; the State's brief ignores all but one (*Beerheide*):

least thirty-five states and the federal government offer a kosher diet in their prisons.  (U.S. Br. 10.)  Their experience shows that doing so need not be complex or expensive. *See Holt v. Hobbs*, 135 S. Ct. 853, 865 (2015) (programs of other institutions relevant to RLUIPA analysis).

Providing a kosher diet is not rocket science.  Most prison systems use prepackaged kosher meals, which are shelf-stable and can be heated in any clean

---

(1) *Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008) (non-meat);

(2) *Beerheide v. Suthers*, 286 F.3d 1179, 1192 (10th Cir. 2002) (kosher);

(3) *Love v. McCown*, 38 F. App'x. 355, 356 (8th Cir. 2002) (per curiam) (kosher);

(4) *Love v. Reed*, 216 F.3d 682, 691 (8th Cir. 2000) (Sabbath meal);

(5) *Ashelman v. Wawrzaszek*, 111 F.3d 674, 678 (9th Cir. 1997) (kosher);

(6) *Willis v. Comm'r, Ind. Dep't of Corrs.*, 753 F. Supp. 2d 768, 778 (S.D. Ind. 2010) (kosher);

(7) *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411 (D. Mass. 2008) (halal);

(8) *Toler v. Leopold*, No. 2:05-CV-82, 2008 U.S. Dist. LEXIS 27121, at *10-12 (E.D. Mo. Apr. 3, 2008) (kosher);

(9) *Buchanan v. Burbury*, No. 3:05-CV-7120, 2006 U.S. Dist. LEXIS 48244, at *17-18 (N.D. Ohio July 17, 2006) (kosher);

(10) *Caruso v. Zenon*, No. 95-MK-1578, 2005 U.S. Dist. LEXIS 45904, at *33-45 (D. Colo. July 25, 2005) (halal);

(11) *Thompson v. Vilsack*, 328 F. Supp. 2d 974, 980 (S.D. Iowa 2004) (kosher);

(12) *Agrawal v. Briley*, No. 02-C-6807, 2004 U.S. Dist. LEXIS 16997, at *12-31 (N.D. Ill. Aug. 25, 2004) (no meat or eggs);

(13) *Madison v. Riter*, 240 F. Supp. 2d 566, 569 n.2 (W.D. Va. 2003) (kosher), *overruled on other grounds*, 355 F.3d 310 (4th Cir. 2003);

(14) *Prushinowski v. Hambrick*, 570 F. Supp. 863, 869 (E.D.N.C. 1983) (kosher).

microwave. Such meals are widely available on airplanes, in hotels, from catering companies, and in hospitals. The U.S. military has provided prepackaged kosher rations to Jewish troops for many years. Joe Gould, *Kosher and Halal MREs Feed Religious Diversity*, ARMY TIMES, Mar. 22, 2010, 2010 WLNR 7044045.

Prepackaged meals are typically supplemented with kosher items from the prison's regular supplies—*e.g.*, vegetables, fruit, eggs, cereal, bread, cheese, tuna, rice, or peanut butter. *See* Joshua Runyan, *Florida Partners With Aleph to Bring Kosher Food to Prisoners*, CHABAD.ORG, July 7, 2010, http://www.chabad.org/news/article_cdo/aid/1246270/jewish/Kosher-Food-Coming-to-FL-Prisons.htm. Nearly half of all supermarket products today are kosher. *New Study: Nearly Half of Supermarket Products are Kosher*, THE MATZAV NETWORK, May 27, 2010, http://matzav.com/new-study-nearly-half-of-supermarket-products-are-kosher. In the Colorado prison system, "[m]ore than half of the food items used to create kosher meals are drawn from [the prisons'] regular supplies." *Caruso v. Zenon*, No. 95-MK-1578, 2005 U.S. Dist. LEXIS 45904, at *38 (D. Colo. July 25, 2005).

To control costs, all prison systems use various measures to limit participation in religious diets. Most obviously, prison systems screen inmates for sincerity. For example, when Florida operated the JDA Program, each inmate was interviewed twice and was required to "demonstrate, by a preponderance of the

evidence, that the self-identified religious faith is sincerely held." DE 29-3 at 11. Other prison systems use similar measures.[3]

Many states also ensure that the kosher diet is no more desirable than the regular diet, thus eliminating the incentive to make insincere claims. This is not hard to do. Because many foods are not kosher, kosher diets typically have less meat and necessarily have less variety. Wyoming thus warns inmates that, "[d]ue to the strict preparation guidelines and limited kosher product availability, the variety of menus and items available for the Kosher Religious Diet Program may be more restricted than those available to others in the general inmate population." *Wyoming Religious Diet Program*, *supra* n.3, at IV.E.2.i.c. *Cf. Moussazadeh v. Tex. Dep't of Criminal Justice*, No. 3:07-CV-00574, 2011 U.S. Dist. LEXIS 106451, at *37 (S.D. Tex. Sept. 20, 2011) (Texas kosher meals "frequently consisted of highly distasteful tofu and other items that were far less appealing than the regular diet").

---

[3] *See, e.g.*, U.S. Dep't of Justice, Federal Bureau of Prisons, No. P5360.09, *Religious Beliefs and Practices* § 548.20 (2004), http://www.bop.gov/policy/progstat/5360_009.pdf ("*BOP Religious Beliefs*") (chaplains conduct oral interviews); Wyoming Dep't of Corrs., Policy & Procedure No. 5.601, *Religious Diet Program for Inmates* at IV.B (2009), http://corrections.wy.gov/Media.aspx?mediaId=138 ("*Wyoming Religious Diet Program*") (inmate must complete a questionnaire, be interviewed by chaplain, and be verified by religious representative); New Mexico Corrs. Dep't, CD-150900, *Food Service Procedures* at Q (rev. 2015), http://cd.nm.gov/policies/docs/CD-150900.pdf (inmates must be "approved by the facility Chaplain").

10

Further, prisons often limit the ability of inmates to transfer into and out of the kosher diet program by changing their religious preference. In federal prison, an inmate who voluntarily withdraws from the religious diet may be required to wait up to thirty days before re-approval. *BOP Religious Beliefs*, *supra* n.3, at 548.20(b). Repeated withdrawals "may result in inmates being subjected to a waiting period of up to one year." *Id.* Other states impose similar restrictions.[4]

Finally, prisons use behavioral controls to weed out insincere inmates. For example, an inmate's sincerity can legitimately be questioned if he is caught eating food from the regular cafeteria line, purchasing non-kosher food from the prison commissary, or trading kosher meals for other items.

These types of controls have enabled prison systems to provide kosher diets at a reasonable cost. Texas, for example, with a larger inmate population than Florida, incurred costs of **$28,324** and **$42,475** to provide a kosher diet in 2008 and 2009.[5] In Michigan, the estimated increased cost of a kosher diet in 2007 was

---

[4] *See, e.g.*, Nebraska Correctional Servs., Admin. Reg. 108.01, *Food Service* at IV.B.5 (2011), http://www.corrections.nebraska.gov/pdf/ar/rights/ AR%20108.01.pdf; Vermont Dep't of Corr., Interim Procedure 354.05, *Inmate Alternative Diets* at § 3.e.ii (2010), http://www.doc.state.vt.us/about/policies /rpd/correctional-services-301-550/351-360-programs-health-care-services/354-05- inmate-alternative-diets-medical-dental-and-religious-2.

[5] Mot. for Summary Judgment, *Moussazadeh v. Tex. Dep't of Criminal Justice*, No. 3:07-CV-00574, Dkt. No. 198 at 36 (S.D. Tex. Dec. 10, 2010).

**$272,000**.[6]   In Indiana in 2008-09, it ranged from **$221,253.32** to **$256,894.68**.[7]

And when Florida itself provided a kosher diet as part of its later-terminated JDA

Program, it found that "the cost of maintaining the JDA Program for one year is

approximately **$146,000**."  DE 29-3 at 17 (emphasis added).

> **B.     The State's Sky-High Participation Rate Is Attributable to Its Own Failure To Properly Screen for Sincerity.**

The State now claims that a kosher diet could cost $12.3 million per year.

(State Br. 1).  This is largely due to its assumption that participation in the kosher-

diet program could be as high as 8% of the entire Florida prison population.  (*Id.* at

28).  But this estimate is wildly out of step with the experience in other states.  The

unnaturally high participation rate in Florida prisons' kosher-diet program provides

a good reason to improve the State's sincerity screening process, but no reason at

all to prevent even unquestionably sincere inmates from adhering to their faith.

**1.**     No state, to our knowledge, has ever come close to a participation rate

of 8%, and Florida studiously avoids addressing the experience of other states.  In

Michigan, just 131 prisoners out of an average of 51,165 enrolled in the kosher

food program, a participation rate of just 0.26%.  *Michigan Audit, supra* n.6, at 7,

---

[6] Michigan Office of the Auditor General, *Performance Audit of Prisoner Food Services* at 15 (2008), http://audgen.michigan.gov/finalpdfs/07_08/ r471062107L.pdf ("*Michigan Audit*").

[7] *See* Mot. for Summary Judgment, *Willis*, 753 F. Supp. 2d 768, Dkt. No. 83-5 at 2-7 & 17 (S.D. Ind. July 19, 2010).

15.  In Texas, only 20-some inmates out of approximately 155,000 participated in a kosher-diet program, for a rate of just 0.01%.  *See* Mot. for Summary Judgment, *Moussazadeh*, *supra* n.5, at 32-33 & nn. 46, 48.  In the federal Bureau of Prisons, approximately 1.2% of prisoners are enrolled in the kosher-diet program—a rate that has remained steady for nearly two decades.  DE 106 at 14; *see also* DE 68 at 136.  And, last but not least, Florida's own JDA Program, which offered kosher meals for three and a half years, had an average enrollment of 250 inmates; at its peak, 364 prisoners were enrolled or sought to enroll.  DE 106 at 3.  That worked out to an average participation rate of 0.25%.  By contrast, the 8% figure now offered by the State in this litigation is approximately 32 times higher.

The experience in these other prison systems is highly relevant under RLUIPA.  As the Supreme Court recently explained—unanimously—"when so many [other] prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course."  *Holt*, 135 S. Ct. at 866.  This Court, too, has emphasized that "practices at other institutions . . . are relevant to an inquiry about whether a particular restriction is the least restrictive means by which to further a shared interest."  *Rich*, 716 F.3d at 534.  Other appellate courts are in accord.  *See, e.g., Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005) (defendants failed to explain "why [other] prison systems are able to meet their indistinguishable interests without infringing on their

inmates' right to freely exercise their religious beliefs"); *Spratt v. R.I. Dep't of Corrs.*, 482 F.3d 33, 39 (1st Cir. 2007) (emphasizing "absence of any explanation by [defendants] of significant differences between [their facility] and a federal prison that would render the federal policy unworkable"); *Haight v. Thompson*, 763 F.3d 554, 563 (6th Cir. 2014) (rejecting prison officials' contention "that an absolute prohibition on sweat lodges serves a compelling government interest when other States allow prison inmates access to them"); *Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 752 (8th Cir. 2014) (citing fact that "other correctional facilities permit inmates to use tobacco for religious purposes" in affirming injunction for RLUIPA plaintiff).

2.      Here, the State asserts that the participation rate in its kosher-diet program will be eight times higher than in the Federal Bureau of Prisons and over 32 times higher than in Michigan and even its own JDA Program.  The State bases these figures on the participation rate in its kosher-diet program at the time the parties filed cross-motions for summary judgment.  (State Br. 12 n.8).  At that time, 8,667 of the approximately 100,000 inmates in the Florida prison system were enrolled in the kosher-diet program.  DE 442-2 at 4.

These sky-high figures indicate the State is doing something wrong.  And indeed, as the District Court correctly concluded, the current participation rate is inflated by several features of Florida's program.  *See* DE 498 at 21.

14

     **a.**    First, and most significantly, the State is doing virtually nothing to screen out inmates who lack a sincere religious need for a kosher meal—even though the Supreme Court has expressly stated that "prison officials may appropriately question whether a prisoner's religiosity . . . is authentic." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). To be sure, like other prisons across the country, the State maintains an application-and-interview process for prisoners who wish to enroll in its kosher-diet program. DE 498 at 5, 8 (Florida); *see supra* n.3 (other prisons). But Florida's religious screening process borders on farcical. That is perhaps best illustrated by the deposition testimony of Chaplain Mack Allen, who explained the so-called "screening" process he conducts under the guidance of his superior chaplains. DE 442-6 at 53.

     To begin, *just before* inmates fill out written applications, Chaplain Allen "specif[ies] to them that" the kosher-meal program "is to fulfill their religious practices." DE 442-6 at 48. If inmates don't get the hint, and fail to identify a religious justification on their written application, Chaplain Allen schedules an interview and "ask[s] them verbally, 'How does this diet help you religiously[?]'" DE 442-6 at 49. If, in response to *that* question, the inmate still gives a vague or non-religious reason for enrolling in the kosher-diet program, Chaplain Allen prods them: "'You gotta give me a little bit more . . . . [H]ow is it going to help you religiously?'" *Id*. Finally, if inmates remain unable to articulate a religious reason

for a kosher diet, Chaplain Allen "give[s] them multiple choices, 'Does this make you closer to God?  Does this make you holy?'"  *Id*. at 51.  And "if [inmates] don't have words," Chaplain Allen testified, he permits them to "use A, B, or C or all of the above."  *Id*. at 51-52.

It bears emphasis that Chaplain Allen is not some rogue agent: His application-and-interview practices are aligned with the State's policies and conducted pursuant to the guidance of his superiors.  *Id*. at 53.  Given all of this, it cannot realistically be said that Florida has a "screening" process for its kosher-diet program at all.  Just the opposite.  Rather than screening *out* non-sincere prisoners from the kosher-diet program, Florida seems to be nudging, prodding, and pushing non-religious prisoners *into* the program.  Indeed, Chaplain Allen testified that he had rejected only two out of "[o]ver 80" applications to the kosher-diet program.  *Id*. at 52.  And even that figure is overstated, as the two inmates who were "rejected" affirmatively insisted that they had no religious reason for enrolling in the kosher-meal program and "actually agreed" not to pursue enrollment. *Id.* at 53.  Small wonder, then, that the participation rate in Florida's kosher-diet program far exceeds that in any other jurisdiction.

As the District Court correctly concluded, a prison system that maintains such a porous screening mechanism—all but *welcoming* plainly insincere prisoners into the program—is not one that is "doing everything in [its] power . . . to ensure

16

that only sincere prisoners participate" in the kosher-diet program.  DE 498 at 21.

And that, in turn, undermines the State's contention that "containing the [kosher-diet program's] costs is such a compelling interest."  *Id*.

   **b.**    The State's assertion that the kosher-diet program's costs are of a "compelling" magnitude is further undermined by Florida's failure to remove inmates from the program even *after* they eat non-kosher food.  There are few better indicators that a person does not have a sincere religious need for a kosher diet than that person's decision to eat non-kosher food.  Yet although the State regularly catches participants in the kosher-diet program purchasing non-kosher food from the prison canteen, and eating non-kosher meals from the prison cafeteria, it has directed prison staff not to suspend such inmates from the program. DE 443-23 at 46-47.  Indeed, the State's Chaplaincy Administrator testified that he had no knowledge of any prisoner being removed from the kosher-diet program for eating non-kosher meals.  DE 443-10 at 113.

   The State asserts that it cannot cost-effectively suspend prisoners from the kosher-diet program because the District Court's "injunction specifically prohibits removal of an inmate . . . without providing the inmate notice and an opportunity to be heard by the chaplain."[8]  (State Br. 44 n.13.)  If Florida were to suspend

---

   [8] *Amicus* fully agrees with the District Court that, under RLUIPA, prisoners must be given an opportunity to "explain how [a] 'non-kosher' selection fits within

prisoners who eat non-kosher food, the State insists, the administrative hearings associated with those suspensions would be "very labor intensive." *Id*. at 43-44.

But that is an exaggeration. Other states have developed simple processes for suspending prisoners from the kosher diet while still giving them an opportunity to be heard—and those processes are *not* "very labor intensive." *See, e.g.*, *Wyoming Religious Diet Program*, *supra* n.3, at IV.D.5 (providing for a streamlined administrative review process in which inmates must appeal termination from a kosher-meal program "in writing"). Florida has not even attempted to explain why it would be any different.  And if the State fears a wave of administrative hearings associated with suspensions, it has only itself to blame. The reason Florida's kosher-diet program is filled with insincere inmates is because the State has inflated the participation rate by refusing to conduct any meaningful screening for religious sincerity *before* enrolling inmates in the program.  Simply put, if the State committed to screening out insincere inmates on the front end, it would not have to spend resources suspending those inmates when they (inevitably) continue eating non-kosher food.

---

his or her religious beliefs prior to removal from the Program."  DE 106 at 26. Among other things, a prison may erroneously designate an item in its commissary as non-kosher.  For example, one Florida prison designated tobacco as non-kosher because it is not certified as such—even though tobacco is not food and therefore need not be so certified.  DE 67 at 139-42.

And notably, the State could conduct a more rigorous front-end screening process without any additional expense or administrative burden. The State's chaplains are *already* tasked with interviewing prisoners who wish to enroll in the kosher-diet program—a task that takes only 2-3 hours per week. DE 442-6 at 46. It would be easy to conduct meaningful sincerity screening during the time prison chaplains already devote to interviews—thereby keeping insincere prisoners out of the program, at no additional cost.

    **c.**    A final point on Florida's bloated kosher-diet program. Even if the State does nothing, the number of inmates enrolled in the program is likely to decline significantly. Indeed, as of March 2015, nearly 7,000 prisoners had already withdrawn from the kosher-diet program statewide. DE 487 at 3. Presumably, the high number of inmate withdrawals is attributable to Florida's lax sincerity screening. When prisoners who lack sincere religious convictions participate in a kosher-diet program, they inevitably grow tired of monotonous kosher offerings, and gravitate back towards standard prison fare. Thus, as time goes on, the number of prisoners enrolled in Florida's kosher-diet program will inevitably dwindle further—providing yet another reason not to credit Florida's 8% participation figure.

\*          \*          \*

Because the high participation rate in Florida's kosher-diet program is entirely attributable to the State's poor implementation, it provides no basis for refusing a kosher diet to sincere prisoners.  Rather, in considering the "costs" of the program, the costs of feeding the insincere inmates should be excluded—because nothing in RLUIPA protects their desire for kosher food.  *Cutter*, 544 U.S. at 725 n.13 ("prison officials may appropriately question whether a prisoner's religiosity . . .  is authentic").  The Tenth Circuit did just that in *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002).   There, Colorado tried to justify restrictions on a kosher diet by citing the experience of Oregon, which had an initial surge in participation when it implemented a kosher diet.  But the Tenth Circuit held that Oregon's experience was irrelevant "because, when [Oregon's kosher diet] was introduced, it placed no restrictions whatsoever on who could participate in the program."  *Id.* at 1190.  It was a "poorly-designed program" and "a model of illogic."  *Id.* at 1190-91.  So is Florida's program here.  And in light of Florida's failure to use "cost reduction methods," the District Court correctly concluded that the State failed to prove "that a blanket denial of kosher meals is the least restrictive means of achieving [its] compelling interest."  DE 498 at 21-22.

20

**C.    The State Has Dramatically Reduced the Per-Inmate Cost of Kosher Food Through Menu Adjustments.**

The other contributing factor to the overall statewide cost of the kosher-diet program is the per-inmate cost of providing kosher food.    Throughout this litigation, the State has repeatedly claimed inflated per-inmate cost figures. But when it comes time to actually *implement* the kosher-meal program, the State has always discovered ways to cut costs.

**1.**    During the preliminary-injunction stage of this litigation, the State told the District Court, in no uncertain terms, that the cost of providing kosher food, on a per-inmate per-day basis, would be $7.35, which was $5.81 per day more than the cost of the regular meal plan (which, at the time, cost only $1.54 per day).    DE 34 at 5.    Those figures encompassed the costs of providing prisoners with hot, "pre-packaged shelf-stable kosher meals" twice a day, "supplemented by bread, fruit, beverages, and breakfast items."    DE 35-1; DE 67 at 114 (same).    The District Court accepted that testimony, yet still found (by considering the likely long-term rate at which inmates would participate in the program) that the costs identified by the State were "not of a compelling magnitude."    DE 106 at 20.

On appeal, the State reported the same figures.    (Appellants' Initial Br., No. 14-10086, at 8 ("The daily cost of kosher meals per inmate was projected to be $7.35").).    And it projected statewide costs by multiplying that figure by its own

expected participation rate.  (*Id.* (projecting annual costs of $86.5 million if 25% of prisoners participate in kosher program).)

    **2.**    Once the State faced a preliminary injunction requiring it to provide kosher meals, however, it quickly found a way to cut the per-inmate cost of its kosher-diet program.   In January 2014, less than two months after the District Court entered its preliminary injunction, the State modified the kosher menu to provide a cold lunch (namely, sardines) rather than a hot lunch.  It also "substituted peanut butter in lieu of the fresh hard-boiled eggs," because of the "cost factor." DE 154-1 at 8; *see also* DE 132-1 at 4 (implementation plan, noting menu change). That change reduced the per-inmate cost of the kosher food to only **$5.76**, which was more than $1.50 less per day than the initial **$7.35** estimate.  DE 132-3.

    Next, in March 2014, the State revised the menu again, this time to switch to an entirely cold-food menu, eliminating the hot prepackaged meals from the equation.  DE 260-6 at 1; DE 132-1 at 4 (notation on implementation plan).  The new menu, which consists of a combination of peanut butter, cereal, bread, beans, cabbage, sardines, and fruits and vegetables—three meals per day, seven days per week—now costs only **$3.55** per-inmate per-day, which is *less than half* of the figure that the State provided to the District Court and this Court, and only $1.67 more than the ordinary meal plan.  DE 132-4; DE 487 at 4.

**3.**    The State's revised menu, and resulting reduced costs, are important for at least two reasons. *First*, the State's newfound ability to slash costs once the preliminary injunction was imposed indicates that it may find further cost-savings now that the District Court has imposed a permanent injunction. And even if no further cost-reductions are possible, the State's demonstrated ability to reduce costs in the midst of litigation indicates that it did not undertake the serious consideration of alternatives that RLUIPA demands when deciding whether to offer a kosher-diet program. *See Warsoldier*, 418 F.3d at 999 (government must "actually conside[r] and rejec[t] the efficacy of less restrictive measures").

*Second*, the revision of the menu makes it very likely that insincere inmates will continue to withdraw from the kosher-diet program. As both parties and the District Court acknowledge, Florida's high participation rate in the program is attributable in part to the fact that the State initially offered prisoners "the Cadillac version" of the kosher meal, perceived to be more attractive than ordinary prison fare. DE 105 at 41-45; see also DE 268 at 4-5. Two prepackaged hot meals per day may have been enticing, but never-ending meals of cabbage, peanut butter, beans, and sardines are not.[9]    Indeed, as noted, nearly 7,000 prisoners have already

---

[9] *Amicus* expresses no view on the adequacy of Florida's kosher diet. *Cf. Cutter*, 544 U.S. at 721 n.10 ("[C]ongressional hearings … revealed that one state corrections system served as its kosher diet 'a fruit, a vegetable, a granola bar, and a liquid nutritional supplement—each and every meal.'").

withdrawn from the kosher-diet program.  DE 487 at 3.  Thus, even if the State does not further pare the costs of kosher meals in response to the District Court's injunction, its *prior* menu revision will continue to reduce the kosher-diet program's participation rate, resulting in further savings.

*          *          *

Flaws in the participation-rate and per-inmate cost figures provided by the State confirm that it has not carried its burden to prove that avoiding the costs of a kosher-diet program would be a "compelling" interest—much less that a blanket denial of kosher meals could be the "least restrictive" means of addressing it.

## II. THE STATE'S LITIGATION CONDUCT CASTS DOUBT ON ITS CREDIBILITY.

In addition, the State's conduct in this litigation—and in other kosher-food suits—suggests an overriding objective to evade judicial oversight.  The State's credibility, and its assurances that it intends to offer a kosher diet statewide even absent an injunction, should be viewed with that in mind.

**A.**    Everything the State has done to implement its kosher-diet program indicates a conscious effort to artificially drive up the program's price tag.  As noted, the State has refused to conduct meaningful religious-sincerity testing prior to enrolling prisoners in the program.  And its early decision to offer the "Cadillac" version of the kosher-diet program not only made the meals more expensive, it also led to sky-high initial participation rates in the kosher-diet program.

24

The illogical, spendthrift manner in which Florida has implemented its kosher-diet program makes sense only if the State is *seeking* to drive up costs in order to prove those costs "compelling"—and thereby win this case, and avoid judicial supervision. Indeed, throughout this litigation, the State has repeatedly tried to use its own profligacy to its advantage. The last time this case was before this Court, for example, the State absurdly claimed that a kosher-diet program could cost up to *$86.5 million* annually. (Appellants' Initial Br., No. 14-10086, at 11.) That astronomical figure was based on the State's claim that, without any sort of religious-sincerity testing, participation in the kosher-diet program would be at least 25% of all inmates, and possibly as high as 44%. (*Id*.) It was also based on an assumption that the State would continue providing uber-expensive "Cadillac" kosher meals—a practice the State had already ceased by the time it submitted its brief to this Court.

The State's repeated decision to assume costs that were entirely avoidable—and then rely on those costs in litigation—diminishes its credibility as to the "compelling" nature of those costs.

**B.**    Further diminishing the State's credibility is its litigation conduct in related matters. This Court recently decided another case challenging Florida's refusal to provide a kosher diet (although the State never even cites it). In that case, *Rich*, 716 F.3d 525, a district court granted summary judgment against the

*pro se* inmate.  The Becket Fund for Religious Liberty, *amicus* here, represented the *Rich* plaintiff on appeal.  After briefing was complete, the State announced that it would adopt a kosher-diet program, effective less than two weeks prior to oral argument, at *only* the facility that housed that plaintiff.  *See Rich*, 716 F.3d at 530. The State then argued "that Mr. Rich's case should be dismissed as moot."  *Id.*

Not surprisingly, this Court disagreed, observing that the policy change was made only "late in the game," *id.* at 532 (quoting *Harrell v. Florida Bar*, 608 F.3d 1241, 1266-67 (11th Cir. 2010)), and "only after Mr. Rich filed his counseled brief to this Court."  *Id.*  "Notably, Florida implemented the plan at the prison where Mr. Rich is incarcerated, and only at that prison, less than two weeks before the oral argument scheduled in this Court.  These facts make it appear that the change in policy is 'an attempt to manipulate jurisdiction.'"  *Id.* (quoting *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011)).  Moreover, even as it committed to provide kosher food prospectively, Florida refused to concede that its prior conduct violated RLUIPA and offered "nothing to suggest that Florida will not simply end the new kosher meal program at some point in the future, just as it did in 2007 [as to the JDAP]."  *Id.*

C.    The proposal that the State floated in *Rich* also called for rolling out a kosher-diet program statewide by September 1, 2013.  *See Rich*, 716 F.3d at 530. Yet, even though the United States had by that point already filed this action and

the parties were supposedly engaged in mediation, "Defendants did not notify the United States of this new policy." DE 106 at 6. Instead, the United States "first learned of the policy on April 2, 2013 from counsel in [*Rich*]." *Id*. And even though the State was supposedly committing to provide kosher food at its prisons statewide, it refused to settle this litigation, citing an unwillingness to sign a consent decree that would allow for judicial enforcement. *See* DE 154-1 at 21 ("[The Court:] I do not understand the emotional philosophical resistance to agreeing to something that you agreed to do. … [Counsel:] I'm sorry, Your Honor, but it is the position of the state that if there is going to be a consent decree, that it is a stumbling block."). In other words, the State is willing to commit to providing a kosher diet so long as nobody can hold it to its word.

Rather than use the new policy to settle the litigation, the State—as it did in *Rich*—argued that it mooted the case entirely, requiring dismissal. *See* DE 34 at 8-11. Even as it argued that it had no statutory obligation to provide a kosher diet in light of its supposedly unworkable cost, the State simultaneously insisted that it had shown a firm "commitment to providing a kosher diet to inmates despite its substantial, ongoing cost." DE 34 at 11. (That, of course, left the State in the pretzel-like position of arguing that it was committed to taking action that supposedly would undermine its own compelling interests. *See* DE 106 at 19.)

27

The District Court expressed skepticism about the mootness argument at a hearing in June 2013, noting that "[b]ased upon the *Rich* decision, it would appear that mootness is not a viable defense at this particular point in time." DE 67 at 5. Shortly thereafter—*i.e.*, as soon as it became clear that the mootness gambit had failed—the State backtracked on its plan to offer a kosher diet statewide by September 2013. In a status report, the State noted that it had "revisited its plan to go statewide as of September 1, 2013," instead suggesting a "staging process" that would introduce kosher food gradually at a handful of institutions. DE 79 at 2-4. The State claimed that its "current goal" was "statewide implementation by mid-to-late 2014." DE 99 at 6. Later, the State proposed "a more tempered expansion" that would not see full implementation until July 2015—nearly two years after the date that formed the basis for its mootness claim. DE 260 at 4-5.

**D.** In short, the State previously established and then cancelled a kosher-diet program (DE 106 at 3-4), and more recently made bold promises of new statewide initiatives, only to backtrack and postpone when those promises failed to moot active litigation. It "committed" to providing a kosher diet at its prisons, but balked at signing a consent decree that would compel adherence to that promise. It offered to engage in mediation, but then unilaterally adopted a new policy without informing the other side. And it did all of this while it maintained a set of illogical policies that artificially inflated the projected costs of its kosher-diet program—

28

costs it later relied upon in litigation.  These shifting plans, inconsistent positions, cost-related gamesmanship, and "attempt[s] to manipulate jurisdiction," *Rich*, 716 F.3d at 532, bely the State's claims of good-faith compliance efforts.

Rather, as the District Court said: "[T]he state has a history now with the Court of Appeals … and to a certain extent with me, that the state wants to give lip service to [RLUIPA], but doesn't want anyone telling it it has to comply with the law."  DE 154-1 at 20.  The State's conduct powerfully reinforces the need for active judicial supervision to ensure that the State complies with federal law and respects the religious rights of its inmates.

## CONCLUSION

For these reasons, this Court should affirm the injunction issued below.

Dated: March 2, 2016                      Respectfully submitted,

/s/ Shay Dvoretzky
Shay Dvoretzky (sdvoretzky@jonesday.com)
Yaakov Roth (yroth@jonesday.com)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

Eli Savit (esavit@jonesday.com)
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI, 48226
(313) 733-3939

*Attorneys for Amicus Curiae*

29

## <u>CERTIFICATE OF WORD-COUNT COMPLIANCE</u>

The undersigned attorney hereby certifies, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c), that the foregoing Brief for *Amicus Curiae* contains 6,849 words, excluding those sections excluded by Rule 32(a)(7)(B)(iii).


<u>/s/ Shay Dvoretzky</u>
Shay Dvoretzky

30

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on March 2, 2016, the foregoing Brief of *Amicus Curiae* was served via the Electronic Case Filing (ECF) on all counsel of record, and that seven paper copies were sent to the Clerk of the Court by certified First Class mail.

<u>/s/ Shay Dvoretzky</u>
Shay Dvoretzky

31